17-1836-cr
*United States v. Capers*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2017

Initially Submitted: May 2, 2018
Last Written Submission: March 18, 2021
Decided: December 14, 2021

Docket No. 17-1836-cr

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

JAMES CAPERS, AKA MITCH,

*Defendant-Appellant,*[*]

B e f o r e:

LEVAL and LYNCH, *Circuit Judges.*[**]

---

[*] The Clerk of Court is respectfully directed to amend the official caption as shown above.

[**] Judge Christopher F. Droney, originally a member of this panel, retired on January 2, 2020. This appeal has been decided by the two remaining members of

James Capers appeals from a judgment of the United States District Court for the Southern District of New York (Pauley, *J.*) sentencing him to 42 years in prison following his conviction by a jury of conspiracy to violate the Racketeer-Influenced and Corrupt Organizations Act ("RICO"), conspiracy to distribute narcotics, and murder through the use of a firearm during a crime of violence or drug trafficking crime. Capers appealed his convictions on the racketeering and firearm charges, initially arguing that there was insufficient evidence to support the jury's findings and that the district court erred in its instructions to the jury as to the firearm-murder offense. While his appeal was pending, a series of cases in the United States Supreme Court and in this Court led to supplemental briefing in which Capers, relying principally on *United States v. Davis*, 139 S. Ct. 2319 (2019), and *United States v. Barrett*, 937 F.3d 126 (2d Cir. 2019), now argues that his murder conviction is invalid because RICO conspiracy is not a crime of violence, and it is impossible to tell whether the jury relied on the district court's instruction that it was such a crime in convicting Capers on the firearm-murder charge. We agree, and VACATE the judgment of the district court as to that charge. We otherwise AFFIRM the judgment of the district court, and REMAND for further proceedings.

SCOTT HARTMAN (Jessica Lonergan, Jason M. Swergold, and Won S. Shin, *on the brief*), Assistant United States Attorneys, *for* Joon H. Kim, Acting United States Attorney for the Southern District of New York, New York, NY, *for Appellee.*

BENJAMIN SILVERMAN (Andrew G. Patel, *on the brief*), Patel & Shellow LLP, New York, NY, *for Defendant-Appellant.*

the panel, who are in agreement. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b); *United States v. Desimone*, 140 F.3d 457, 458-59 (2d Cir. 1998).

GERARD E. LYNCH, *Circuit Judge*:

Following a six-day trial, a jury in the United States District Court for the Southern District of New York found James Capers, a member of a street gang known as the Leland Avenue Crew (the "Leland Crew" or "Leland"), guilty of conspiracy to violate the Racketeer-Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d); conspiracy to possess narcotics with intent to distribute, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846; and murder through the use of a firearm during and in relation to a crime of violence or a narcotics offense, in violation of 18 U.S.C. § 924(j)(1).[1] The district court (William H. Pauley III, *J.*) sentenced Capers to imprisonment for 444 months (37 years) on the racketeering and narcotics conspiracy charges, to run concurrently, and an additional 60 months (5 years) on the firearm-murder charge. Capers appeals from that judgment.

---

[1] The jury also specifically found that the pattern of racketeering activity that Capers agreed would be committed included the murder of Allen McQueen and a conspiracy to distribute, or possess with intent to distribute, 280 grams or more of crack cocaine. The jury acquitted Capers on three other charges: murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); murder in connection with a drug crime, in violation of 21 U.S.C. § 848(e); and using a firearm in relation to the charged racketeering and drug crimes, in violation of 18 U.S.C. § 924(c).

Capers initially challenged his convictions by arguing that there was insufficient evidence to support the jury's finding that the murder with which he was charged was in furtherance of either the racketeering enterprise or the narcotics conspiracy charged in the indictment, and that the district court erred in failing to instruct the jury that it must find that Capers committed premeditated murder in order to convict him under § 924(j).

After the briefing was complete, a series of decisions in the Supreme Court and in this Court interpreting and invalidating aspects of the definition of "crime of violence" underlying Capers's murder conviction led to several rounds of supplemental briefing regarding the validity of that conviction, as the law continued to evolve. Essentially, Capers now contends that under current law, most particularly the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), and this Court's decision in *United States v. Barrett*, 937 F.3d 126 (2d Cir. 2019) ("*Barrett II*"), the district court's instruction that RICO conspiracy is a crime of violence for purposes of § 924(j) was plainly erroneous, and that his conviction on the firearm-murder charge must therefore be vacated.

We agree that under binding precedent from the Supreme Court, RICO conspiracy is not a crime of violence for purposes of § 924(j). Because it is unclear

4

whether the jury based its decision to convict Capers of the firearm-murder offense on the erroneous belief, in light of the trial court's instruction, that RICO conspiracy is such a crime, Capers's conviction of that offense must be vacated. Capers has not shown error as to any other conviction. We therefore VACATE Capers's conviction as to Count Five, AFFIRM the remainder of the judgment, and REMAND for further proceedings consistent with this Opinion.

## BACKGROUND[2]

At trial, Capers explicitly conceded that on the afternoon of July 7, 2015, he shot and killed Allen McQueen. The evidence showed that Capers ran up behind McQueen as McQueen was walking down a Bronx street holding his eleven-month old daughter in his arms, and fatally shot him in the side, the bullet traversing both his lungs and the vein that delivers blood to the heart. Capers did not contend at trial that he had not murdered McQueen; rather, his defense was that the murder was not a federal crime, because the murder was a "solo project" of personal revenge that he undertook on his own, and that had nothing to do

---

[2] The facts that follow, most of which are not disputed, are based on the evidence presented at trial, taken in the light most favorable to the jury's verdict.

with his involvement in the Leland Crew's racketeering and narcotics activities. Appellant's Br. at 21.

The jury heard extensive evidence about that involvement. Capers was a member of the Leland Crew, which operated primarily around Leland Avenue in the Bronx. Indeed, Capers's membership in the gang is not seriously disputed on appeal. The government presented evidence that Leland Crew members sold marijuana and crack cocaine between 2009 and 2015, and that Capers had been arrested for selling crack cocaine on Leland Avenue as early as March 2009. Several cooperating witnesses testified that Capers continued to sell cocaine and marijuana between 2009 and his arrest for the instant offenses in 2015.

The Leland Crew was also involved in a violent rivalry with another gang, the Taylor Avenue Crew (the "Taylor Crew" or "Taylor"). Taylor Avenue is only a street away from Leland Avenue, and the Taylor and Leland gangs competed for business in the neighborhood, resulting in considerable tension between the groups. Violence between the gangs escalated between 2009 and 2014. After a Leland member shot a Taylor member in November 2014, members of the Taylor Crew vowed to retaliate by murdering Leland's leader, Pablo Beard. Just a few

months later, in March 2015, Beard was shot and killed by two Taylor Crew members, Elijah Davila and Allen McQueen.

Leland members, angered at the murder of Beard and worried that the Taylor Crew would attempt to take advantage of their perceived weakness if they failed to retaliate, discussed the need to take revenge. Members posted warnings on social media that Beard would be avenged. Capers, who was in prison at the time of Beard's murder, considered Beard his best friend, and thus had a particular interest in revenge against Davila and McQueen. After his release from prison he joined other Leland Crew members in creating a YouTube video warning that Beard would be violently avenged – a video that a Leland member testified at trial was meant to let "[t]he enemy, the Taylor" know that "[n]obody is going to get away with . . . [k]illing Pablo." Tr. 231. On more than one occasion, Leland members went to Taylor Avenue looking for McQueen and calling his name. Capers himself warned McQueen's girlfriend to "be careful and stay away from [McQueen]." Tr. 504. His cellphone contained text messages showing that he too was looking for McQueen.

On the afternoon of the murder, Capers asked one of his (and formerly, Beard's) marijuana customers for a ride, ostensibly to go to Harlem to replenish

7

his marijuana supply. Once under way, however, he instructed the customer to drive down Taylor Avenue, purportedly to look for one of his suppliers. Capers spotted McQueen, ordered the car to stop, got out of the car and, as described above, shot McQueen, who managed to run a block, still holding his child, before he collapsed and died. Capers returned to the car and told the driver that he had just "blammed" someone. Tr. 563.

Shortly after Beard's murder, Capers advised an incarcerated fellow Leland member by telephone that McQueen had been killed. Other Leland Crew members posted a news article on Facebook about McQueen's killing, accompanied by references to Beard and the rivalry between the gangs. Capers himself wrote notes in his cellphone two days after the killing, that referenced cooking crack, the gun violence in the neighborhood, and how his "gang" was "up to no good," noting that "now that nigga shot" and that now "we on all these blocks." SA 44.

After a day and a half of deliberations, the jury returned the verdict described above. Following an unsuccessful round of post-trial motions and the imposition of sentence, Capers filed a timely notice of appeal.

# DISCUSSION

As noted above, Capers challenges the sufficiency of the evidence to support certain of his convictions, and also raises two challenges to the instructions that were given to the jury with respect to the firearms-murder charge. Because insufficiency of the evidence would require reversal of the challenged convictions and entry of a judgment of acquittal, *see, e.g., United States v. Bramer*, 956 F.3d 91, 99 (2d Cir. 2020), while a finding of instructional error would require only vacatur of the conviction and a remand for a new trial, *see, e.g., United States v. Silver*, 948 F.3d 538, 547, 572 (2d Cir. 2020), we address the sufficiency argument first.

## I.  Sufficiency of the Evidence

Capers raises sufficiency of the evidence challenges to two of his convictions. First, he argues that there is insufficient evidence to support the jury's finding on Count One that the pattern of racketeering activity that he agreed to commit included the murder of McQueen. Second, he argues that his § 924(j) conviction cannot stand because there is no evidence that he murdered McQueen in relation to either the racketeering conspiracy or a drug trafficking crime. Both arguments are meritless.

9

"We review preserved claims of insufficiency of the evidence *de novo*." *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020). Even on de novo review, however, "defendants face a heavy burden" because we must sustain the jury's verdict if, "credit[ing] every inference that could have been drawn in the government's favor" and "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020) (internal quotation marks omitted). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Atilla*, 966 F.3d at 128 (internal quotation marks omitted).

**A. The RICO Conspiracy Charge**

As part of Capers's conviction of RICO conspiracy, the jury found, inter alia, that the pattern of racketeering activity that Capers agreed would be committed as part of the Leland Crew enterprise included the murder of Allen McQueen. On appeal, Capers acknowledges that there is sufficient evidence to support his conviction of RICO conspiracy, but argues that there was insufficient evidence to support the jury's finding that the murder of McQueen was part of

10

the pattern of racketeering activity to which he agreed. We disagree.[3]

Looking at the evidence in the light most favorable to the government, a rational trier of fact could have concluded that the murder of McQueen was part of the RICO enterprise. Capers does not deny that he killed McQueen. He argues, however, as he did at trial, that he committed that murder solely "to avenge his best friend's murder" and not for any reason connected to the Leland RICO conspiracy. Appellant's Br. at 24, 26. The jury rejected that argument, however, after hearing extensive evidence that Capers was a member of the Leland Crew, that Leland and Taylor would commit violent acts against one another in order to maintain territory and respect, and that Capers both participated, before McQueen's murder, in group Leland Crew threats to avenge the murder of their leader, and wrote notes after McQueen's murder that a reasonable juror could find linked the murder of McQueen to the success of the Leland Crew.

Leland members testified at trial that affiliates of the gang were required to "put[] in work," meaning that they would "[h]urt[] the enemy" to boost the

---

[3] The government argues that we should review Capers's challenge to the jury's Count One findings for plain error, because, in its view, he did not adequately preserve that challenge. We need not decide whether the issue was properly preserved because, even assuming that de novo review applies, the evidence is sufficient to support the jury's finding.

gang's image, maintain loyalty and respect, and to enable the gang to continue its profitable enterprise selling drugs. Tr. 150, 199. Moreover, specifically with respect to the murder of McQueen, there was evidence that Capers's successful effort to hunt down and kill McQueen was intertwined with, and furthered, the Leland Crew's collective desire for revenge. Before the McQueen murder, other gang members expressed concern that the gang's interests demanded retaliation against Taylor for the killing of Beard. Capers's interest in revenge not only paralleled the gang's; there was evidence that he shared its collective goal. Thus, he participated in the creation of the video, posted on YouTube, that was expressly intended as a message to Taylor, the "enemy," that the Leland Crew would not let anybody "get away with . . . [k]illing Pablo." Tr. 231.

Almost immediately after he shot McQueen, moreover, Capers communicated to a jailed Leland member that McQueen had been killed. Capers also made notes in his cell phone a few days later associating gun violence and the fact that the "nigga [got] shot" (which a reasonable juror could infer was a reference to McQueen) with the activities of his "gang," the cooking of crack, and his gang's ability to be "on all these blocks," SA 44, again paralleling social media

12

boasts from other gang members during the same period that their leader's death had been avenged.

From all of that evidence, a trier of fact could reasonably draw the inference that Capers's murder of McQueen was an instance of a Leland member striking back at "the enemy" to bolster the racketeering enterprise. It may well be that Capers, perhaps like other members of the gang, was particularly motivated to avenge Beard's death because of his personal friendship with Beard. But nothing about that additional motive is inconsistent with the conclusion, which could rationally be drawn from the evidence, that Capers was loyal not only to Beard personally, but to the gang that Beard led, and that he, along with other Leland members, joined in the purpose of furthering the gang's interests by hunting down and retaliating against one of the members of the rival Taylor Crew who had played a role in Beard's murder. *See United States v. White*, 7 F.4th 90, 101-02 (2d Cir. 2021) (holding, in the context of § 1959, that defendant's "personal motive for committing an act of violence" does not preclude finding that he was also "motivated by a desire to increase or maintain his position in the RICO enterprise").

**B. The Firearm-Murder Charge**

The jury also found that the murder of McQueen violated § 924(j), which makes it illegal to "cause[] the death of a person through the use of a firearm," 18 U.S.C. § 924(j), in relation to a crime of violence or drug trafficking crime. Capers argues that the evidence was insufficient to support the jury's determination that the murder had a nexus to either a crime of violence or a drug trafficking crime. For substantially the same reasons just discussed, the evidence permitted the jury to find that Capers murdered McQueen during and in relation to the narcotics conspiracy charged in the indictment, which overlapped with and indeed formed part of the RICO conspiracy.[4] On appeal, Capers does not challenge the jury's finding that he was guilty of participating in that narcotics conspiracy. Nor does he challenge the trial court's instruction to the jury that Capers could be convicted of the § 924(j) count if "the firearm [] played some part in furthering the [narcotics] crime." App'x at 278. And, as discussed above, the jury heard evidence permitting it to infer beyond a reasonable doubt that the murder of

---

[4]As discussed in Section II.A below, the jury could not lawfully convict Capers on the firearms-murder charge for his use of a firearm in relation to a RICO conspiracy, because RICO conspiracy is not a crime of violence. Thus, we must determine only whether there is sufficient evidence to sustain the verdict based on a valid drug trafficking predicate.

McQueen was motivated by an effort to preserve the Leland Crew's reputation and its ability to protect and extend its drug-dealing territory. As we have held in the related context of murder in aid of racketeering in violation of 18 U.S.C. § 1959, there is no inconsistency between a crime that is motivated in part by personal objectives and a finding that the crime was also committed "at least in part" for purposes related to a criminal enterprise. *United States v. Arrington*, 941 F.3d 24, 38 (2d Cir. 2019). From the evidence at this trial, a properly-instructed "rational trier of fact could [find] the essential elements of [§ 924(j)] beyond a reasonable doubt," *Ho*, 984 F.3d at 199 (internal quotation marks omitted).[5]

## II.    The Jury Instructions

Capers raises two claims of error in the district court's instructions to the jury concerning the firearms-murder count. First, he argues that the judge erred in advising the jury that the RICO conspiracy count in the indictment was a crime of violence that could serve as a predicate offense for a firearms-murder charge under 18 U.S.C. § 924(j). Second, he argues that the judge erred in refusing his

---

[5] To the extent that the jury here was not properly instructed, a new trial on the firearm-murder charge, rather than a judgment of acquittal on that charge, is appropriate.

request that the jury be instructed that only killings that are premeditated can constitute "murder" within the meaning of that statute.

"We review de novo a properly preserved challenge to a jury instruction, reversing where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule." *United States v. Binday*, 804 F.3d 558, 581-82 (2d Cir. 2015) (internal quotation marks omitted). Objections to jury instructions that were not presented to the trial court, however, are reviewed for plain error. *United States v. Grote*, 961 F.3d 105, 114 (2d Cir. 2020). "Under plain error review, we consider 'whether (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Martinez*, 991 F.3d 347, 351 (2d Cir. 2021), quoting *United States v. Miller*, 954 F.3d 551, 557-58 (2d Cir. 2020).

**A.  Did the Court Commit Plain Error by Instructing the Jury that RICO Conspiracy is a Crime of Violence on which a Section 924(j) Violation Can Be Predicated?**

*1. The Charge Was Erroneous.*

As relevant to this case, 18 U.S.C. § 924(j) provides for an enhanced penalty for an individual who, "in the course of a violation of [18 U.S.C. § 924(c)], causes the death of a person through the use of a firearm," with the specific penalty depending on whether the killing is classified as murder or manslaughter. Section 924(c), in turn, prohibits the use or carrying of a firearm "during and in relation to . . . or . . . in furtherance of" a crime of violence or drug trafficking crime. Capers does not dispute that the narcotics conspiracy of which he was convicted is a drug trafficking crime that could be the predicate for a violation of § 924(c) (and thus also of § 924(j)). The district court, however, instructed the jury that it could convict Capers of the § 924(j) firearms-murder charge if it found, beyond a reasonable doubt, that he used or carried a firearm, causing the death of McQueen, "during and in relation to *either* the racketeering conspiracy charged in Count 1 *or* the drug trafficking conspiracy charged in Count 3," Tr. at 965 (emphasis added), because "the racketeering conspiracy charged in Count 1 is a crime of violence," *id*. at 967. It is that instruction to which Capers now objects.[6]

---

[6] Capers stipulated to the instruction because, under then prevailing law in this Circuit, "a conspiracy to commit a crime of violence [was] itself a crime of violence within the meaning of § 924(c)(1)." *United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996). To the extent that the substantive RICO crime that Capers conspired to commit involved a violent predicate act as part of the pattern of

17

For purposes of §§ 924(c) and 924(j), a crime of violence is defined by statute as a felony that either "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," 18 U.S.C. § 924(c)(3)(A) (the "force clause"), or "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," *id*. § 924(c)(3)(B) (the "residual clause"). In *Davis*, however, the Supreme Court invalidated the residual clause as unconstitutionally vague. 139 S. Ct. at 2336. Thus, the statute's force clause is the only remaining valid definition of a crime of violence for purposes of the firearms statute under which Capers was convicted.

Moreover, the Supreme Court has long held that to be a crime of violence under the force clause, a crime must *categorically* involve the use of force. *See Taylor v. United States*, 495 U.S. 575, 588-90 (1990). In other words, it is not enough

racketeering through which the RICO offense was to be committed, the object offense could have been a crime of violence, *see Martinez*, 991 F.3d at 356-57, and so under our pre-*Davis* case law the charged conspiracy would also be a crime of violence. The government does not argue that Capers intentionally waived his present contention that the prior circuit law has been superseded; in consequence, we may consider that argument on appeal. *See United States v. Eldridge*, 2 F.4th 27, 36 n.11 (2d Cir. 2021) (noting that the government can waive the issue of waiver). But because Capers failed to object to the instruction, as discussed above, we may reverse only for plain error.

18

that the evidence in the case shows that the defendant committed the charged

predicate crime in a way that involved the use of force (as, indeed, it did here).

Instead, the predicate crime must be one whose elements are defined in such a

way that the crime must, "in every instance[,] by its very definition, involve[] the

use of force." *Martinez*, 991 F.3d at 353.

The parties now disagree as to whether RICO conspiracy qualifies as a

crime of violence under the force clause.[7] The government argues that "the

racketeering conspiracy *in this case* has as an element the use of physical force"

because it "involved the murder of Allen McQueen." Govt. Letter (Dkt. 128) at 1-

2 (emphasis added). For his part, Capers argues that racketeering conspiracy

does not require an overt act and therefore *cannot* qualify as a crime of violence

---

[7] The government's position on this issue has twice changed. In opposition to
Capers's supplemental brief following the Supreme Court's decision in *Dimaya*,
the government argued that "racketeering conspiracy with violent predicate acts
is a 'crime of violence.'" Govt. Supp. Br. (Dkt. 82) at 11. Then, in briefing
submitted after *Davis*, the government conceded that racketeering conspiracy is
*not* a crime of violence and therefore cannot be a predicate for the § 924(j)
conviction. Govt. Supp. Br. (Dkt. 118) at 3. Finally, in a Rule 28(j) letter filed on
March 17, 2021, the government reverted to its prior position that "the
racketeering conspiracy charged and proved in this case is a crime of violence
and a valid predicate for Capers's Section § 924(j) conviction." Govt. Letter (Dkt.
128) at 1.

because it "lacks, as an element, the actual, threatened, or attempted use of physical force."Appellant's Supp. Br. (Dkt. 117) at 9.

The government's position is unsustainable. The categorical approach directs us that to determine whether an offense constitutes a crime of violence, we are to consider not the particular conduct disclosed by the evidence presented in the case, but the *elements* of the offense as defined by statute, to determine whether forcible conduct is legally required to be proved in order to establish a violation of the statute. *See United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018). In contrast to a *substantive* violation of RICO under 18 U.S.C. § 1962(c), which requires proof of the commission of specifically listed state or federal crimes (some of which are categorically violent crimes) as part of a "pattern of racketeering" in the course of conducting the affairs of an enterprise, a RICO *conspiracy* offense under §1962(d) requires only that a defendant "conspire" – in other words, agree – to violate one of RICO's substantive prohibitions.

To be convicted of conspiracy under § 1962(d), the government must prove only "that a defendant *agreed with others* (a) to conduct the affairs of an enterprise (b) through a pattern of racketeering." *United States v. Basciano*, 599 F.3d 184, 199 (2d Cir. 2010) (emphasis added). The defendant "need not commit or even agree

to commit the predicate acts." *United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012). He must only "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive RICO offense." *Id.*, quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997) (alteration omitted). In other words, "the agreement proscribed by section 1962(d) is a conspiracy to participate in a charged enterprise's affairs through a pattern of racketeering, not a conspiracy to commit predicate acts." *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009) (internal quotation marks and alterations omitted). Summarizing this long line of cases, we recently explained that

> [t]he essence of a RICO conspiracy is the existence of an *agreement* to violate RICO's substantive provisions. Though the substantive RICO offenses require proof of an enterprise and a pattern of racketeering activity, the establishment of an enterprise is not an element of the RICO conspiracy offense. The government need only prove that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme. [To sustain a conviction, we must conclude that] the evidence permitted a conclusion that the defendant knowingly agreed with others to function as a unit for the common purpose of engaging in racketeering activity.

*White*, 7 F.4th at 98-99 (footnotes, citations, internal quotation marks, and alterations omitted; alteration added).

21

RICO conspiracy is thus a crime that can be committed simply by sitting around a table and agreeing with other individuals to create an organization like the Leland Crew, that would engage in criminal acts like selling narcotics and, indeed, committing various violent crimes, whether or not the organization ever gets off the ground and whether or not the defendant, or any of his co-conspirators, ever commits any of the anticipated crimes. Indeed, unlike the general federal conspiracy law, 18 U.S.C. § 371, a RICO conspiracy does not even require that any of the conspirators commit even a single overt act toward the commission of such crimes. *Salinas*, 522 U.S. at 63.[8]

The case of RICO conspiracy is thus indistinguishable from the case of Hobbs Act conspiracy we faced in *Barrett II*, 937 F.3d at 127. As in that case, even

---

[8] The description above of the elements of RICO conspiracy does not just describe "a theoretical possibility." *United States v. McCoy*, 995 F.3d 32, 57 (2d Cir. 2021) (internal quotation marks omitted). For example, this Court has affirmed a defendant's conviction of RICO conspiracy where the predicate racketeering acts were completed outside the five-year limitations period, because "the agreement proscribed by section 1962(d) is conspiracy to participate in a charged enterprise's affairs, not conspiracy to commit predicate acts," and the conspiracy thus continues until the "accomplishment or abandonment" of the broad conspiratorial goals, even absent the commission of additional predicate acts. *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987); *see also Pizzonia*, 577 F.3d at 463-66 (explaining that the government is not limited to the predicate acts that were pleaded to prove a conspiracy to participate in an enterprise's affairs).

22

though the crimes that were the object of the conspiracy were crimes of violence, and even though the particular acts committed by the defendant and his co-conspirators during the course of the conspiracy were "violent, even murderous," *id*. at 128, the mere *agreement* to commit such crimes does not require the use of force – or any action beyond the agreement itself – and therefore is not categorically a violent crime.

That this conclusion applies to RICO conspiracies as to others can come as no surprise. We have said as much on several occasions, although our statements could be seen, strictly speaking, as dicta, or were in the context of summary orders. Thus, in *Martinez* we noted that "[w]e can *assume* that the [RICO] conspiracy violation is not a crime of violence because . . . a conspiracy offense cannot categorically involve the use of force, since its key element is simply an agreement to commit a crime. . . . [and] because no violent act [i.e., no act requiring use of force] . . . must be committed in order to be guilty of the offense." 991 F.3d at 354 (emphasis added; emphasis omitted). But in *Martinez* we needed only to assume that this was so; because the defendant there pled guilty to using a firearm in furtherance of both a conspiracy and a substantive RICO offense, our conclusion that it was not plain error for the district court to have

23

concluded that the *substantive* RICO charge in the indictment was a crime of violence was sufficient to dispose of the case. In *United States v. Heyward*, we quoted the above language from *Martinez* in concluding that a racketeering conspiracy did not constitute a crime of violence even though one of the charged predicate racketeering acts was a conspiracy to commit murder, because even a conspiracy to commit murder "is *not* a qualifying offense under § 924(c)." 3 F.4th 75, 82 (2d Cir. 2021) (emphasis in original).[9] We similarly cited the *Martinez* language in *United States v. Kilpatrick*, in support of the conclusion that "the government correctly concedes . . . [that] it was a clear and obvious error for each defendant to be convicted of the § 924(c) charge with the RICO conspiracy as the

---

[9] *Heyward* could be read as looking through the RICO conspiracy charge to the underlying predicate acts to determine whether the RICO conspiracy was a crime of violence, as the *Martinez* court noted is arguably to be done in the case of substantive RICO charges. But any such implication was not necessary to the decision, since the conclusion was that the RICO conspiracy in that case would not be a crime of violence *even if* such an approach were correct. For the reasons stated in the text, we do not think that a RICO conspiracy charge can be found to be a crime of violence, regardless of the predicate crimes that were contemplated in the agreement to form a racketeering enterprise. RICO conspiracies, like murder conspiracies or Hobbs Act conspiracies, are not categorically crimes of violence because conspiratorial crimes by their nature can be committed without the use of force. Whether the goal of the RICO conspiracy is to create an enterprise that will commit murder or will merely conspire to do so, the agreement to form or conduct such an enterprise is not itself a violent crime.

24

predicate crime of violence." 2021 WL 3354737, at *2 (2d Cir. Aug. 3, 2021)
(summary order).

Although these cases may not constitute binding precedent, their results
confirm that we have never, since the Supreme Court's decision in *Davis*, upheld
a § 924(c) conviction predicated on a RICO conspiracy charge, and that we have
instead strongly suggested that RICO conspiracies, like other conspiracies to
commit violent crimes, do not categorically require the use of force, and thus are
not valid predicates for § 924(c) charges.[10]

---

[10] Prior to *Davis*, "it ha[d] long been the law in this circuit that a conspiracy to
commit a crime of violence [was] itself a crime of violence under 18 U.S.C.
§ 924(c)(3)." *United States v. Barrett*, 903 F.3d 166, 175 (2d Cir. 2018) ("*Barrett I*"),
*vacated*, 139 S. Ct. 2774 (2019). That conclusion was ultimately based on the logic,
traceable to *United States v. Chimurenga*, that "a conspiracy to commit an act of
violence is an act involving a substantial *risk* of violence." 760 F.2d 400, 404 (2d
Cir. 1985) (emphasis added), and that a conspiracy to commit a violent crime "by
its very nature presents a substantial risk of physical force" and is thus a violent
crime under the residual clause. *Barrett I* , 903 F.3d at 175. But *Barrett I* and many
other decisions applying the same logic to conspiracies to commit various violent
crimes (including RICO conspiracies with violent predicate acts), *see United States
v. Desena*, 287 F.3d 170, 181 (2d Cir. 2002) (conspiracy to commit assault in aid of
racketeering); *United States v. Patino*, 962 F.2d 263, 267 (2d Cir. 1992) (kidnapping
conspiracy); *United States v. Praddy*, 729 F. App'x 21, 23 (2d Cir. 2018) (summary
order) (RICO conspiracy "if at least one of its objects is committing a crime of
violence"); *United States v. Scott*, 681 F. App'x 89, 95 (2d Cir. 2017) (summary
order) (same), have been abrogated by *Davis*'s invalidation of the residual clause.

In sum, it cannot be the case that RICO conspiracy *categorically* "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). Thus, RICO conspiracy is not a crime of violence.

The government attempts to avoid this conclusion by characterizing Capers's offense as "aggravated RICO conspiracy" on the theory that "murder was an element of the racketeering conspiracy [charged and proved in this case] . . . thereby increasing the maximum penalty for" the crime. Govt. Letter (Dkt. 128) at 1-2; *see also* 18 U.S.C. § 1963(a) (increasing the maximum statutory penalty from twenty years to life "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment"). The operative indictment included a notice of special sentencing factors that alleged that Capers "caused the death of McQueen" and distributed or possessed with intent to distribute "280 grams [or] more of . . . cocaine base" as part of the racketeering conspiracy. App'x at 26. On its verdict sheet, the jury found both of those special factors beyond a reasonable doubt. Thus, the government argues, the jury's finding necessarily means Capers's conviction "involve[d] the use of physical

26

force" because "murder was an element of the . . . conspiracy." Govt. Letter (Dkt. 128) at 1.

That argument, however, misconceives the nature both of RICO conspiracy, as discussed above, and of the relevant sentence enhancement. Assuming arguendo that the enhanced maximum sentence provision of § 1963(a) in effect creates a separate crime of "aggravated RICO," that provision references the sentencing provisions of the predicate acts charged as parts of the alleged pattern of racketeering activity to which the conspirators agreed to determine the maximum sentence for the RICO conspiracy. In this case, the murder of McQueen was charged as one of the racketeering acts constituting the pattern through which Capers was alleged to have *conspired* to operate the Leland enterprise. The maximum sentence to which he was subject was enhanced because one of the crimes alleged as part of the object pattern of racketeering was murder in violation of New York law, which carries a maximum penalty of life in prison.[11]

---

[11] The enhanced penalty provision increased the maximum punishment to life in prison "if the violation is *based on a racketeering activity* for which the maximum punishment includes life imprisonment." § 1963(a) (emphasis added). The "racketeering activity" on which the RICO conspiracy charge was "based" included an act of murder that carried such a maximum punishment, but it did

But Capers's guilt of the offense charged in the indictment, including the enhanced penalty element, was not dependent on whether he actually did murder McQueen (though of course, the proof that he *did* murder McQueen was highly probative of the charge that Capers had agreed to join an enterprise that was dedicated, among other criminal goals, to murdering enemies of the Leland

---

not require proof that the murder that was among the objects of the conspiracy actually came to fruition in order for the maximum penalty to apply. There is nothing unusual about that; federal conspiracy statutes often provide the same punishment for those who actually commit an offense or for those who "attempt[ ] or conspire[ ]" to do so. 18 U.S.C. § 1951(a) (extortion or robbery that obstructs interstate commerce); 21 U.S.C. § 846 (narcotics offenses). RICO similarly applies the same punishment to violations of both the substantive and conspiracy provisions of the statute. *See* 18 U.S.C. § 1963(a) (applying same penalties for violating "*any* provision of section 1962.") (emphasis added).

The out-of-circuit cases that the government cites its in letter brief are inapposite because those cases analyzed whether "conspiracies that are categorically defined to result in death" are crimes of violence. *United States v. Tsarnaev*, 968 F.3d 24, 104 (1st Cir. 2020) (discussing provision punishing conspiracies to plant bombs in public places where "death results" with death or life in prison, 18 U.S.C. §§ 2332f(a), 2332a(a)); *see also United States v. Runyon*, 994 F.3d 192, 202-03 (4th Cir. 2021) (discussing a "death results" element in murder for hire statute, 18 U.S.C. § 1958(a)). Both opinions recognize that conspiracies to commit violent crimes ordinarily are not themselves violent crimes, but distinguish statutes requiring a finding that "death results." *Tsarnaev*, 968 F.3d at 104; *Runyon*, 994 F.3d at 203. However, as described above, the enhanced penalty provision that applied to Capers did not require the government to prove that a death actually resulted from the commission of the conspiratorial offense. *See United States v. McClaren*, 13 F.4th 386, 230 (5th Cir. 2021) (distinguishing *Tsarnaev* and *Runyon* from aggravated RICO conspiracy because of the "death results" element); *United States v. Simmons*, 11 F.4th 239, 260-61 (4th Cir. 2021) (same).

Crew). The indictment charged not that Capers participated (in violation of

§ 1962(c)) in conducting the affairs of the enterprise through a pattern of

racketeering that included the murder of McQueen, which would have required

proof beyond a reasonable doubt that he committed at least two specified

racketeering acts, but that he and a co-defendant "knowingly *combined, conspired,*

*confederated, and agreed* together and with each other to violate § 1962(c)," by

engaging in a pattern of racketeering acts that included murder, in violation of

§ 1962(d). S5 Superseding Indt., ¶¶ 8, 8(a)(iii) (emphasis added). As explained

above, *that* crime required proof beyond a reasonable doubt only that Capers and

others *agreed* to do those things, not that Capers (or anyone else, for that matter)

ever actually committed those crimes.

RICO, including RICO conspiracy, is an "unusual[ly] complex crime"

covering "a multitude of sins" ranging from mail fraud to murder. *Martinez*, 991

F.3d at 356. But even assuming that the substantive RICO crime defined in

§ 1962(c) can sometimes be considered a violent crime by applying a variant of

the modified categorical approach based on the particular predicate acts found to

be parts of the charged pattern of racketeering (a theory that we concluded in

*Martinez* was at least not plain error to adopt), the relationship between

29

substantive and conspiracy RICO crimes presents a simpler problem. That relationship is precisely the same as that between other substantive crimes (including violent crimes) and the crime of conspiracy to commit them. Even where the substantive crime that is the object of a conspiracy necessarily requires the use of force, a conspiracy to commit it does not. Thus, the district court erred in instructing the jury that RICO conspiracy is a crime of violence.

### 2. The Error is Clear and Obvious.

Next, the government argues that even if the district court's jury instruction was erroneous, that error is not clear or obvious. Whether there is an error that is clear or obvious "'is established at the time of the appeal,' not as of the time that the district court ruled." *Martinez*, 991 F.3d at 357, quoting *United States v. Dussard*, 967 F.3d 149, 156 (2d Cir. 2020). The government is correct that, until now, this Court has not, since *Davis* and *Barrett II*, addressed in a published opinion whether RICO conspiracy is a crime of violence.[12] However, there is

---

[12] In two summary orders, we have characterized RICO conspiracy as a crime of violence where "the jury finds two RICO predicates constituting crimes of violence have been proven" because "conspiracy to commit that crime is itself a crime of violence." *Scott*, 681 F. App'x at 95, citing *Elder*, 88 F.3d at 129; *see also Praddy*, 729 F. App'x at 23. However, *Scott* and *Praddy* predated *Davis*, and relied on the rationale articulated in *Elder*, which, as explained above, has been abrogated by *Davis* and *Barrett II*.

certainly no rule that an "absence of circuit precedent" precludes a finding of plain error. *See United States v. Murphy*, 942 F.3d 73, 86 (2d Cir. 2019) (finding plain error despite this Court not having made an "explicit" determination on the issue). Instead, we must determine whether the error is "clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993).

*Davis* and *Barrett II*, decided while this appeal was pending, clearly foreshadowed the conclusion that we reach today. In fact, we alluded to this exact conclusion in a prior opinion. *See Martinez*, 991 F.3d 354 ("We can assume that [RICO conspiracy] is not a crime of violence under the force clause because, as the Supreme Court's decision in *Davis* reasoned, a conspiracy offense cannot categorically involve the use of force . . . .") (emphasis omitted). Furthermore, every one of our sister circuits to have considered *post-Davis* whether RICO conspiracy ("aggravated" or not) is a crime of violence has held that it is not. *See United States v. McClaren*, 13 F.4th 386, 412-14 (5th Cir. 2021); *United States v. Simmons*, 11 F.4th 239, 254-61 (4th Cir. 2021); *United States v. Green*, 981 F.3d 945, 951-52 (11th Cir. 2020);  *United States v. Jones*, 935 F.3d 266, 271 (5th Cir. 2019); *United States v. Davis*, 785 F. App'x 358, 360-61 & n.2 (9th Cir. 2019). Lastly, this Court has long described the RICO conspiracy statute as "most closely analogous

31

to other conspiracy statutes pursuant to which overt acts in furtherance of the conspiracy need not be pleaded or proven," such as Hobbs Act robbery conspiracy, *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987), and *Barrett II* made clear that Hobbs Act robbery conspiracy is *not* a crime of violence, 937 F.3d at 129. Thus, *Barrett II* further supports our conclusion that it is sufficiently "clear or . . . obvious" that RICO conspiracy is not a crime of violence "under current law." *Olano*, 507 U.S. at 734. The district court's erroneous instruction therefore satisfies the first two plain error criteria.

### 3. Effect on Substantial Rights

Capers was charged in Count Five with a § 924(j) sentence enhancement based on his conviction of "*either* the racketeering conspiracy charged in Count 1 [as a crime of violence] or the drug trafficking conspiracy charged in Count 3 [as a drug trafficking crime]." Tr. at 965 (emphasis added). The jury's verdict was general. It marked "[g]uilty" in response to a question asking "How do you find the Defendant James Capers with respect to Count Five?" App'x at 293. The jury did not delineate whether it based its Count Five conviction on the RICO conspiracy, the narcotics conspiracy, or both. Capers argues that the district court's error requires that we vacate his § 924(j) conviction because "there is no

32

way of knowing whether the guilty verdict was based on [that] error."

Appellant's Supp. Br. (Dkt. 75) at 12. The government urges us to affirm the

conviction because "it was clearly supported by a narcotics conspiracy predicate

presenting no legal concern." Govt. Supp. Br. (Dkt. 82) at 22.

This case comes on appeal under plain error review, and we correct such

errors "only where the appellant demonstrates that . . . the error affected the

appellant's substantial rights . . . [and] seriously affects the fairness, integrity or

public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258,

262 (2010) (internal quotation marks omitted). "In the ordinary case . . . to have

impacted [a defendant's] substantial rights and the fairness . . . of the judicial

proceedings, the overall effect of the . . . error must have been sufficiently great

such that there is a *reasonable probability* that the jury would not have convicted

him absent the error." *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010)

(emphasis added).

Under the rule of *Yates v. United States*, 354 U.S. 298 (1957), *overruled on*

*other grounds by Burks v. United States*, 437 U.S. 1, 8-10 (1978), an instructional

error is of serious concern "where disjunctive theories of culpability are

submitted to a jury that returns a general verdict of guilty, and one of the theories

was legally insufficient. In such circumstances, it is impossible to tell which ground the jury selected, the legally sufficient ground or the insufficient one." *United States v. Agrawal*, 726 F.3d 235, 250 (2d Cir. 2013) (internal quotation marks, citations, and alterations omitted).[13] When we detect a *Yates* error of the sort at issue in this case, plain error review requires us to determine whether the defendant was "prejudiced by the error" by asking whether "the erroneous jury instruction was harmless beyond a reasonable doubt." *Eldridge*, 2 F.4th at 39 & n.16 (internal quotation marks omitted). Because Capers has shown "a reasonable probability that the jury may not have convicted him" on the § 924(j) count absent the district court's error, *Marcus*, 628 F.3d at 42, we agree that his conviction should be vacated.

Relying on our decision in *United States v. Vasquez,* 672 F. App'x 56 (2d Cir. 2016) (summary order), the government argues that Capers cannot demonstrate

---

[13] In contrast, where one of two alternative theories of liability fails for evidentiary insufficiency, we may assume that the jury relied on the theory that was sufficiently supported, and did not perversely return a guilty verdict based on a theory that was supported by such weak evidence that no reasonable jury could have accepted it. *See United States v. Rutkoske*, 506 F.3d 170, 176 (2d Cir. 2007) (citations omitted) ("[T]he Supreme Court has held that a verdict should be affirmed when two theories of an offense are submitted to the jury and the evidence supports one theory but not the other. In such cases, courts assume that the verdict is based on the valid theory.").

that any error affected his conviction because the invalid racketeering conspiracy predicate "was 'inextricably intertwined' with the charged narcotics conspiracy." Govt. Supp. Br. (Dkt. 82) at 22-23, quoting *Vasquez*, 672 F. App'x at 61.[14] To support its position, the government points to the jury's unanimous agreement that the pattern of racketeering activity involved the murder of McQueen *and* a narcotics conspiracy, its finding in Count Three that Capers participated in a narcotics conspiracy, and the fact that the jury was instructed that a conviction on the § 924(j) count could be predicated on either the racketeering conspiracy charged in Count One or the narcotics conspiracy charged in Count Three or both. Thus, in the government's view, the "[s]ection 924(j) conviction *undoubtedly* rested on a valid drug-trafficking predicate" because there is a drug trafficking

---

[14] The government notes that "Capers does not argue that his claim . . . calls for this Court to employ a modified plain error analysis under which the Government would bear the burden of demonstrating that any error did not affect a defendant's substantial rights." Govt. Supp. Br. at 17 n.5; *see United States v. Viola*, 35 F.3d 37, 42 (2d Cir. 1994) (placing burden on the government "to show that plain error in light of a supervening decision did not affect substantial rights . . . when the supervening decision alters a *settled* rule of law in the circuit") (emphasis in original). The "modified" plain error review articulated in *Viola*, however, has been "clearly abrogated" by the Supreme Court. *Eldridge*, 2 F.4th at 37. Thus, Capers bears the burden of showing that the error affected his substantial rights.

component to both predicate counts. Govt. Supp. Br. (Dkt. 118) at 9 (alteration omitted; emphasis added).[15]

But that conclusion does not necessarily follow. It is true that the jury made two findings of guilt that, in theory, could be predicates for a § 924(j) conviction: the narcotics conspiracy charged in Count Three and the narcotics conspiracy charged as a predicate racketeering act in Count One, both of which are "drug trafficking crime[s]." 18 U.S.C. § 924(c)(2). The jury also found that Capers used a gun and caused death in furtherance of *at least one* of either the RICO conspiracy charged in Count One or the narcotics conspiracy charged in Count Three. But none of the jury's instructions required it to make a specific finding that either the narcotics conspiracy predicate to the RICO conspiracy offense *or* the narcotics conspiracy charged in Count Three was the basis for its § 924(j) verdict.

_____

[15]  The government appears to assume that the narcotics conspiracy charged as a predicate in Count One is the same conspiracy charged in Count Three, but that assumption is not necessarily supported by the record. The court never instructed the jury of a need to find that the narcotics conspiracy in Count One was the same as charged in Count Three, and the verdict sheet specified a finding only that the RICO conspiracy involved "*a* conspiracy to distribute or possess with intent to distribute narcotics." App'x at 290 (emphasis added). Furthermore, the indictment describes the membership in the two conspiracies differently in that Count One specifies the Leland Crew whereas Count Three does not.

The jury's general verdict thus does not definitively say whether the killing of McQueen was in furtherance of either the narcotics conspiracy predicate in Count One or the narcotics conspiracy charged in Count Three, as opposed to the general RICO conspiracy charged in Count One. Of course, if it *were* clear that the jury found that Capers used a gun in furtherance of the narcotics conspiracy charged as a predicate act in Count One, that would be enough to affirm Capers's conviction, because it would mean that the jury necessarily rested its verdict on a drug trafficking crime. But we cannot assume that the jury made that finding, and to whatever extent the jury relied on Count One as the predicate for the Count Five conviction, it does not follow that it found that the murder was in furtherance of any particular predicate racketeering act.

It is entirely plausible that the jury rested its Count Five verdict on the general RICO conspiracy. Count One charged that the overall conspiracy had as its goals not only the promotion of the gang's drug enterprise, but also "to protect fellow members and associates of the Enterprise," and that its violent acts, including murder, were "intended either to protect the Enterprise's drug territory, retaliate against members of rival gangs who had encroached on the territory controlled by the Enterprise, or to otherwise promote the standing and

reputation of the Leland Avenue Crew amongst rival gangs." App'x at 21. The

purposes of the Enterprise as a whole were described as including, in addition to

narcotics-related goals:

> a. Preserving and protecting the power, territory, and
> profits of the Enterprise through murder, attempted
> murder, robberies, and other acts of violence, and
> threats of violence[,]
> b. Promoting and enhancing the Enterprise and the
> activities of its members and associates[, and]
> c. Keeping victims and potential victims in fear of the
> Enterprise and its members and associates through acts
> and threats of violence.

*Id*. Thus, the jury could have based its verdict on a finding that Capers killed

McQueen in retaliation for the murder of the Leland Crew's leader in order to

"promote the standing and reputation" of the Leland Crew and to keep its rivals

"in fear of the Enterprise and its members." *Id.* That would suffice to convict if (as

the jury was instructed) the Count One conspiracy were a crime of violence. Such

a conclusion by the jury would have been supported by the evidence, and would

not have referenced any narcotics conspiracy.

Nor can we conclude, based on the government's theory at trial, that the

predicate acts supporting the RICO conspiracy were "intertwined" with the

narcotics conspiracy in Count Three, as the predicate offenses were in *Vasquez.* In

that case, we concluded that a defendant's § 924 convictions predicated on two "inextricably intertwined" offenses, one of them a drug trafficking crime, "present[ed] no legal concern." *Vasquez*, 672 F. App'x at 61. Vasquez was convicted of §§ 924(c) and (j) charges predicated on conspiracy to commit Hobbs Act robbery and a narcotics conspiracy. *Id*. at 60. After assuming that Hobbs Act robbery conspiracy was *not* a crime of violence – an assumption later confirmed by this Court in *Barrett II* – we sustained the convictions on the ground that the charges were "clearly supported by a narcotics predicate" because the *sole* theory presented at trial was that a co-conspirator fatally discharged a firearm "to rob drug dealers and to distribute any recovered narcotics." *Id*. at 61. Since the goal of the robbery conspiracy was to obtain narcotics to distribute, the robbery conspiracy was itself an integral part of the narcotics conspiracy. Thus,"the robbery was an act inextricably intertwined with . . . the charged narcotics conspiracy, . . . the jury found that narcotics conspiracy proved beyond a reasonable doubt," and the murder occurred during the joint commission of those two crimes. *Id*.

But that is not what happened here. The RICO conspiracy was not "presented as part of the proved narcotics scheme." *Id*. Instead, it charged Capers

with a broad conspiracy to violate the substantive RICO statute from 2009 to 2015, and the jury convicted Capers of that charge after finding that he agreed that he or a co-conspirator would participate in the conduct of the affairs of Leland through a pattern of racketeering activity that included the murder of Allen McQueen and the distribution or possession of narcotics. There is no indication that the RICO conspiracy was "inextricably intertwined" with the separately charged narcotics conspiracy in Count Three. *Id*. Nor is there any indication that the two predicate acts supporting the RICO conspiracy were necessarily connected.

In short, the jury found Capers guilty of conspiring to violate RICO and that various unspecified narcotics crimes were part of the pattern that was the object of the RICO conspiracy. The jury's verdict on RICO conspiracy means that it necessarily found that Capers agreed to further a criminal plan that would involve people selling drugs, among other things, but that says nothing about what, if anything, Capers personally would do to participate in the predicate narcotics conspiracy, nor does it say anything about whether the killing of McQueen was in furtherance of that narcotics conspiracy, rather than in the broader interest of the enterprise in furthering its violent dominion.

Undoubtedly, as discussed above, the evidence at trial would have permitted the jury to base a § 924(j) verdict on a finding that his use of a firearm to murder of McQueen was in furtherance of the narcotics conspiracy charged in Count Three. Capers argues, however, that, because the jury *acquitted* him of a separate count (Count Four) charging him with committing murder "while engaged in" the conspiracy charged in Count Three in violation of 21 U.S.C. § 848(e)(1)(A), App'x. 29-30, it is "far from speculative" to conclude that the jury may have reached a different verdict as to Count Five had it not been instructed that RICO conspiracy is a crime of violence. Appellant's Supp. Br. (Dkt. 75) at 15. In his view, that acquittal presents a reasonable likelihood that "the jury rejected the government's contention that the McQueen murder was in furtherance of or even in relation to narcotics distribution." Appellant's Supp. Br. (Dkt. 117) at 10.

Of course, we are not in the business of policing verdicts for the consistency of the jury's findings of guilty and not guilty on various counts. *See, e.g., United States v. Powell*, 469 U.S. 57, 64-67 (1984) (explaining that inconsistent verdicts are unreviewable on appeal). But that is not what Capers is asking us to do. One reason we do not evaluate verdicts for inconsistency is to avoid "inquiring into a jury's thought processes," *id*. at 67, because a jury may reach an

41

inconsistent conclusion due to "mistake, compromise, or lenity" and it is often "unclear whose ox has been gored," *id.* at 65. Here, however, Capers is not arguing that there is an inconsistency between the jury's verdicts on different counts that we must review and correct. Instead, he has identified an independent error, and to receive relief, he bears the burden of showing that the error is "sufficiently great such that there is a reasonable probability that the jury would not have convicted him absent the error." *Marcus*, 628 F.3d at 42. A defendant may attempt to meet that high burden by pointing to the jury's verdicts on other counts as evidence of what the jury might have done if the error were not present. That is what Capers has done here.

To meet his burden under plain error review, Capers must show that he was "prejudiced by the error," which, when raising a *Yates* issue on a § 924(c) conviction, requires the defendant to show that the error was *not* "harmless beyond a reasonable doubt." *Eldridge*, 2 F.4th at 39 & n.16 (internal quotation marks omitted). In assessing a defendant's arguments, we often look to verdicts on other counts to see whether those verdicts clarify the verdict on the *Yates*-affected count by showing that the jury, in convicting on other counts, necessarily made findings that would require a guilty verdict on the contested count on a

theory independent of the instructional error. It is thus entirely appropriate for a court to consider the jury's verdicts on other counts if those verdicts are relevant to determining whether "the jury would have returned a guilty verdict . . . if" the valid predicate were the only predicate charged. *Id*. at 39; *cf. id.* at 39-40 (looking at the jury's convictions as to three counts and noting that those verdicts "reinforced the conclusion" that the *Yates* error was harmless beyond a reasonable doubt).

In this case, the split verdict supports Capers's argument. There is no particular reason to relate the firearm-murder conviction to a specific subpart – the narcotics conspiracy – of the racketeering charge, rather than to the entire racketeering conspiracy. Nor can that conviction be persuasively connected to the narcotics charge in Count Three, given that the jury acquitted Capers on Count Four, which charged him with murdering McQueen while "engaging in" the narcotics conspiracy charged in Count Three. 21 U.S.C. § 848(e)(1)(A). The district court instructed the jury that it could convict Capers of Count Four if the murder was "in some way related or connected" to the narcotics conspiracy, Tr. at 963, but the jury evidently declined to make that finding beyond a reasonable doubt. It is not plausible to infer from the pattern of verdicts that the jury necessarily

43

convicted Capers on Count Five on the theory that he murdered McQueen "in furtherance of" the drug trafficking conspiracy charged in Count Three, 18 U.S.C. § 924(c)(1)(A), after it declined to find that the murder was "in some way related or connected," Tr. at 963, to that same narcotics conspiracy. Thus, the Count Four acquittal supports Capers's position that the district court's error is not harmless beyond a reasonable doubt.[16]

We thus cannot infer from the pattern of the jury's verdicts that it necessarily rested its guilty verdict on the firearm-murder charge either on the narcotics conspiracy of which he was convicted under Count Three or on the narcotics conspiracy (assuming it was not quite the same conspiracy) charged as one of the predicate acts that were agreed to in the RICO conspiracy charged in Count One. It follows that there is a reasonable probability that the jury found him guilty on Count Five based on the theory that the use of a firearm to murder McQueen was in furtherance of the general conspiracy to operate the Leland Crew enterprise through a pattern of racketeering as charged in Count One, as it

---

[16] That the jury also acquitted Capers of murder in aid of racketeering does not undermine our reasoning. In order to avoid a reversible *Yates* error, we must find that the error was not harmless beyond a reasonable doubt. The question before us is thus whether jury's verdicts preclude such a finding by establishing that the jury must have found that the killing of McQueen was tied to a narcotics crime.

was instructed – erroneously – that it could do. It follows that the error affected Capers's substantial rights.

### 4. *The Error Seriously Affects the Fairness and Integrity of the Proceedings.*

The last factor need not detain us long. Perhaps some members of the public might shrug off the elaborate analysis that we have been required to undertake. Some might be perplexed as to why, in assessing whether a crime should be called "violent," we look to how a crime might in theory be committed under its definition, rather than at the fact that the crime the defendant actually committed manifestly involved severe violence, or why the Supreme Court concluded that neither ordinary citizens nor trained judges can reliably determine whether a crime, "by its nature, involves a substantial risk" that physical force will be used in its commission. Lay readers may also wonder why these inquiries lead to the possibility that a man who concedes that he committed a murder is not guilty of the particular homicidal crime that he was charged with in federal court.

But at the end of the day, we are bound by the Constitution that effectively restricts the federal government to prosecuting murders only under specified

conditions, by the words of the statutes adopted by Congress in defining the offenses it has chosen to create, and by the decisions of the Supreme Court interpreting both the Constitution and those statutes. We cannot uphold a conviction where there is a reasonable likelihood that the jury may have returned a guilty verdict based on a theory that it was erroneously told would justify a conviction for violating the statute under which the defendant was charged. To ignore such an error on the ground that even if the defendant was not guilty of the crime of which he was convicted, he was certainly guilty of an equally serious crime with which he could have been charged in a state court would surely compromise the fairness of the proceedings and the integrity of the judicial system.

At the same time, we note that, as we have held above, the evidence presented here was sufficient to permit a properly instructed jury to convict on Count Five. We vacate the conviction on that count not because Capers necessarily should be exonerated as a matter of law of the crime charged, but rather because an erroneous jury instruction makes it impossible to be confident that the jury convicted him on an appropriate set of findings. The proper remedy,

accordingly, is not to dismiss the charge, but to remand for further proceedings, including a new trial if the government chooses to pursue the count further.

Moreover, even if the government chooses not to proceed on that count, the erroneous conviction affected not just the sentence imposed on that count, but the entire sentence imposed on Capers for all the counts of conviction. The sentence of only five years in prison for the murder charge that was the most serious count of conviction, while a sentence of thirty-seven years was imposed on other charges, cannot be the product of a conclusion that the murder of McQueen warrants only a five-year sentence. Especially given that the murder was itself a predicate act that was an object of the RICO conspiracy, one might expect a court to have imposed concurrent terms on all counts, based on an integrated assessment of the appropriate sentence for Capers based on the totality of the circumstances, including the murder. But that course was precluded by the fact that the firearm-murder charge mandated a sentence consecutive to the sentence imposed on other counts of conviction. *See* 18 U.S.C. § 924(c)(1)(D)(ii) (prohibiting imposition of concurrent terms for the firearm charge and the underlying predicate crime). It therefore appears likely that the court imposed the total sentence it believed appropriate for the conduct proved

at trial, and constructed a pattern of sentences on the individual counts that would effectuate that result consistent with the consecutive sentence mandate of § 924(c), as it was fully authorized to do, *see Dean v. United States*, 137 S. Ct. 1170 (2017).

Accordingly, we remand with instructions to the district court to consider whether to vacate the entire sentence and impose a new judgment and sentence as it deems appropriate, or to allow the sentences on the counts other than Count Five to stand.

## B. Does a Killing Constitute Murder Under the Relevant Statutes Only if it is Premeditated?

Capers also argues that the judge erred by failing to instruct the jury that to constitute murder in violation of § 924(j) a killing must be premeditated. Capers acknowledges that he did not object to the judge's charge on this ground in the district court, and that our review must therefore be only for plain error. Since we have already determined that the conviction must be vacated and the matter remanded for a new trial based on a different error, it is not strictly necessary to address that argument to determine this appeal. Now that appellate counsel has identified the issue, however, it is predictable that, if the government elects to

retry Capers on Count Five, Capers will seek such an instruction at that trial.

Accordingly, in the interests of judicial economy, we exercise our discretion to address the issue for the guidance of the district court on any retrial. *See United States v. Hardwick*, 523 F.3d 94, 102 n.8 (2d Cir. 2008) (citations omitted) ("When a retrial is a possibility, we routinely rule on fully argued issues that will arise in such a retrial, lest serial appeals, reversals, and multiple trials result.").

Fortunately, the issue is easily resolved. Capers's argument fails because the lower court's failure to give a premeditation instruction was not erroneous at all, let alone plainly so.

Capers was charged with murder under § 924(j)(1). Under that provision, a person who causes the death of another by the use of a firearm in the course of a violent or narcotics felony is subject to capital punishment or imprisonment up to a maximum of life "if the killing is a murder (as defined in [18 U.S.C. §] 1111)"; under § 924(j)(2), lesser penalties are provided if the killing constitutes manslaughter as defined in § 1112. Capers, through selective quotation of § 1111, contends that murder is defined in that provision to require premeditation.

That is simply not the case. Section 1111(a) provides, in full, as follows:

49

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

18 U.S.C. §1111(a).

On a plain reading of the statute, the first sentence defines "murder." The definition is brief and (at least to any lawyer schooled in the common-law tradition) straightforward: "Murder is the unlawful killing of a human being with malice aforethought." The remainder of the section is concerned not with the definition of murder, but with the division of murder into two degrees. First-degree murder includes murders that are premeditated, as well as murders committed by certain means or in the course of certain felonies; all murders that do *not* fit into those categories fall into the residual category of murder in the second degree.

A lay reader might think that the "malice aforethought" element of the definition of murder is largely a synonym for "premeditated." But that natural reading is absolutely precluded by history; "malice aforethought" is a traditional term of art in the common law. As the American Law Institute described the common-law background of the phrase:

> At common law, murder was defined as the unlawful killing of another human being with malice aforethought. Whatever the original meaning of that phrase, it became over time an arbitrary symbol used by judges to signify any of a number of mental states deemed sufficient to support liability for murder.

Amer. Law Inst., Model Penal Code and Commentaries, § 210.2 cmt. 1 at 13-14 (footnotes and internal quotation marks omitted). "First and foremost" among those mental states was "intent to kill." *Id.* at 14.[17]

---

[17] Other commonly accepted types of "malice" at common law included awareness that death would occur from the defendant's actions even if that result was not specifically desired; intent to cause grievous bodily harm; killings that resulted from extremely reckless conduct characterized as "depraved heart" murders; and the intention to commit a felony. Amer. Law Inst., Model Penal Code and Commentaries, § 210.2 cmt. 1 at 14-15. Though these categories may be, roughly speaking, incorporated into the meaning of malice in § 1111, we make no attempt to catalogue the full scope of that section, and note the common-law categories simply in order to give a general account of the historical meaning of the term "malice aforethought"and to demonstrate that the term extends beyond killings that are premeditated.

The term "premeditation" entered the law via the enactment, in Pennsylvania in 1794, of the first statute dividing murder into degrees and limiting first-degree murder to premeditated killings and a few other circumstances in a manner nearly identical to the federal statute now codified as § 1111. *Id*. cmt. 2 at 16. Any killing that was *not* premeditated but was nevertheless committed with the intent to kill remained murder (unless it qualified for the partial defense of provocation that would reduce the crime to manslaughter), but was classified as murder in the second degree. Section 1111 thus essentially codifies the common-law meaning of murder, as modified by the practice, inaugurated in America and still common to many states, of dividing murder into degrees (and limiting the death penalty to murders defined as first-degree).

It is not necessary here to define the precise, and long-controverted, contours either of "premeditation" or of the provocation that would reduce an intentional killing to manslaughter. The first issue is irrelevant because § 924(j)(1) applies to all *murder*, and does not limit its reach only to murder in the first degree. The second is irrelevant because Capers makes no claim that his killing of McQueen would constitute manslaughter. What is important here is that there is

no plausible argument that "premeditation" is required for a killing to constitute murder as defined in §§ 924(j)(1) and 1111. We have, indeed, so recognized, albeit in a summary order. *United States v. Gonzalez*, 399 Fed. App'x 641, 647 (2d Cir. 2010). Other circuits agree. *See, e.g.*, *United States v. Julian*, 633 F.3d 1250, 1256 (11th Cir. 2011); *United States v. Williams*, 342 F.3d 350, 356 (4th Cir. 2003); *United States v. Ricketts*, 317 F.3d 540, 545 (6th Cir. 2003).[18] Lest there be any doubt, we now make the point clear in a published opinion.

## CONCLUSION

Accordingly, the judgment of the district court is VACATED as to Count Five. We otherwise AFFIRM the judgment of the district court and REMAND for further proceedings consistent with this Opinion, with authorization to the district court in its discretion to vacate the sentences and resentence the defendant on all counts due to the elimination of the sentence on Count Five.

---

[18] The cases from other circuit courts cited by Capers as purportedly holding that premeditation is required for a murder conviction are plainly inapposite, as they are cases in which the defendant was charged with *first-degree* murder. *United States v. Delaney*, 717 F.3d 553, 556 (7th Cir. 2013); *United States v. Dale*, 614 F.3d 942, 962 (8th Cir. 2010). The cited cases thus referred to premeditation as an element of first-degree murder, and in no way suggest that it is an element of all classes of murder.

53