15-3807-cr (L)
*United States v. Laurent*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2017

(Argued: May 2, 2018        Decided: April 26, 2022)

Docket Nos. 15-3807-cr (L), 15-3848-cr, 16-1794-cr (Con)

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

JAMAL LAURENT, also known as Tails, TREVELLE
MERRITT, also known as Tiger, YASSER ASHBURN, also
known as Indio, also known as Swerve, also known as Supa
Swerve 6, also known as Yassen Ashburn
*Defendants-Appellants,*

RICKY HOLLENQUEST, also known as Dancer, DEVON
RODNEY, also known as D-Bloc, HAILE CUMMINGS, also
known as Ruger, also known as Rugan, GERALDO
ELAINOR, also known as Gunny, also known as Geraldo
Casimir, DANIEL HARRISON, also known as Bones, RALIK
ODOM, also known as Ra-Ra, also known as Rahleek
Odom.
*Defendants.**

_____

---

* The Clerk of Court is respectfully directed to amend the caption as set forth above.

15-3807-cr (L)
*United States v. Laurent*

Before:

LEVAL and LYNCH, *Circuit Judges.*†

Yasser Ashburn, Jamal Laurent, and Trevelle Merritt appeal from judgments of the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *J.*) convicting them of crimes arising from their participation in a street gang known as the Six Tre Outlaw Gangsta Disciples Folk Nation. All three were convicted of violating the Racketeer-Influenced and Corrupt Organizations Act ("RICO") (Count One), of conspiring to violate RICO (Count Two), and of unlawful use of firearms "during and in relation to a crime of violence . . . ." in violation of 18 U.S.C. § 924(c) (Count Three). In addition, Ashburn was convicted of murder in aid of racketeering (Count Four), Laurent was convicted of assault with a dangerous weapon in aid of racketeering (Count Six) as well as additional violations of § 924(c) (Counts Seven and Ten), and both Laurent and Merritt were convicted of Hobbs Act robbery conspiracy and attempted Hobbs Act robbery conspiracy (Counts Eight, Nine, Eleven, and Twelve). While this appeal was pending, this Court concluded that RICO conspiracy could not be a crime of violence for purposes of § 924(c). *United States v. Capers*, 20 F.4th 105, 118-19 (2d Cir. 2021). We VACATE Merritt's Count Three conviction, because we cannot be confident that the jury's § 924(c) conviction rested on a valid predicate. We REVERSE Laurent's Count Ten conviction with prejudice, because Hobbs Act robbery conspiracy cannot be a crime of violence under § 924(c). *See United States v. Barrett*, 937 F.3d 126, 130 (2d Cir. 2019). We reject Defendants' other challenges and otherwise AFFIRM the judgments in all respects.

BRUCE R. BRYAN, Bryan Law Firm, Syracuse, NY, *for Defendant-Appellant Jamal Laurent*.

ROBERT ROSENTHAL, New York, NY, *for Defendant-Appellant Trevelle Merritt*.

---

† Judge Christopher F. Droney, originally a member of this panel, retired on January 2, 2020. This appeal has been decided by the two remaining members of the panel, who are in agreement. See 28 U.S.C. § 46(d); 2d Cir. IOP E(b); *United States v. Desimone*, 140 F.3d 457, 458-59 (2d Cir. 1998).

RANDA D. MAHER, Law Office of Randa D. Maher, New York, NY, *for Jamal Ashburn*.

MARGARET LEE, Assistant United States Attorney, (Emily Burger, M. Kristin Mace, Assistant United States Attorneys, *on the brief*) *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee*.

LEVAL, *Circuit Judge*:

Yasser Ashburn, Jamal Laurent, and Trevelle Merritt (together, "Defendants") appeal from judgments of the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *J.*) convicting them of crimes arising from their participation in a violent Brooklyn street gang known as the Six Tre Outlaw Gangsta Disciples Folk Nation ("Six Tre" or the "Gang").[3] Defendants were convicted, in various combinations, on twelve counts, including violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); conspiracy to violate RICO; murder in aid of racketeering; firearms offenses; and related crimes. On

---

[3] Decision of this case was delayed by the panel's need to await its turn in a queue of cases pending in this Circuit resolving questions arising from the Supreme Court's ruling in *United States v. Davis*, 139 S. Ct. 2319, 2324 (2019), interpreting "crime of violence."

appeal, Defendants contend, among other arguments, that the evidence was insufficient to sustain their convictions; and that certain of the offenses of conviction do not qualify as predicate "crimes of violence" under 18 U.S.C. § 924(c). Ashburn also challenges the reasonableness of his life sentence.

**BACKGROUND**

The Six Tre gang committed robberies, murders, and other acts of violence. Members would typically join the Gang as "foot soldiers" and advance their status by contributing financially or committing acts of violence. At times, the Six Tre gang would go to war with rival gangs. Members were expected to demonstrate their loyalty to the Six Tre and uphold its honor by killing and committing other acts of violence against members of rival gangs.

At the times relevant to this appeal, Defendant Ashburn was the Gang's primary leader, sometimes referred to as the "Big Homie." Defendants Laurent and Merritt were foot soldiers.

Defendants were charged in a fourteen-count superseding indictment (the "Indictment") with crimes committed from 2008 through 2011. Following a five-week jury trial involving testimony of more than 35 witnesses

(including three cooperating defendant-witnesses), the jury found the Defendants guilty on twelve of the fourteen counts. All three were convicted on Count One (the "substantive RICO" count) of racketeering in violation of 18 U.S.C. § 1962(c); on Count Two (the "RICO conspiracy" count) of racketeering conspiracy in violation of 18 U.S.C. § 1962(d); and on Count Three of unlawful use of firearms "during and in relation to a crime of violence or drug trafficking crime" in violation of 18 U.S.C. § 924(c). The complete list of counts of conviction is shown in the table below:

| Defendant | Offense | Count |
|---|---|---|
| Ashburn, Laurent, & Merritt | Racketeering, 18 U.S.C. § 1962(c) | 1 |
| Ashburn, Laurent, & Merritt | Racketeering conspiracy, 18 U.S.C. § 1962(d) | 2 |
| Ashburn, Laurent, & Merritt | Unlawful use of firearms, 18 U.S.C § 924(c) | 3 |
| Ashburn | Murder in aid of racketeering, 18 U.S.C. § 1959(a)(1) | 4 |
| Laurent | Murder in aid of racketeering, 18 U.S.C. § 1959(a)(1) | 5 |
| Laurent | Assault with a dangerous weapon in aid of racketeering, 18 U.S.C. § 1959(a)(3) | 6 |

| Laurent | Unlawful use of firearms, 18 U.S.C § 924(c) | 7 & 10 |
|---------|-----------------------------------------------|--------|
| Laurent | Hobbs Act robbery conspiracy and attempted Hobbs Act robbery conspiracy, 18 U.S.C. § 1951(a) | 8 & 9 |
| Merritt | Hobbs Act robbery conspiracy and attempted Hobbs Act robbery conspiracy, 18 U.S.C. § 1951(a) | 11 & 12 |

Each defendant was sentenced to prison terms as follows:

For Ashburn, life in prison on Counts One and Two, concurrently; life in prison on Count Four, consecutive to Counts One and Two; and 10 years in prison on Count 3, consecutive to the other terms.

For Laurent, life in prison on Counts One and Two, concurrently; life in prison on Count Three, consecutive to all other counts; life in prison on Count Seven, consecutive to all other counts; 20 years on Counts Six and Eight, concurrent with each other and with Counts One and Two; life in prison on Count Ten, consecutive to all other counts; and life in prison on Count Five, consecutive to all other counts.

For Merritt, 30 years on Counts One and Two, concurrently; 20 years on Counts Eleven and Twelve concurrently with each other and with Counts One and Two, and 10 years on Count Three, consecutive to all other counts.

## DISCUSSION

**I.** **Sufficiency of Evidence**

We turn first to the Defendants' claims of insufficiency of evidence. Our review is *de novo*, in that we do not defer to the District Court's determination as to evidence sufficiency. *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). However, in conducting our own review of the trial record, we "view the evidence in the light most favorable to the government, crediting every inference that could have been [reasonably] drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012); *see also United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021) ("The jury's inferences . . . must be reasonable."). "[W]e will uphold the judgments of conviction if *'any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Coplan*, 703 F.3d at 62 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

All three Defendants contend the trial evidence was insufficient to convict them on the Count One charge of racketeering in violation of RICO, 18 U.S.C. § 1962(c), and the Count Two charge of RICO conspiracy in violation of 18 U.S.C. § 1962(d). Ashburn and Laurent also challenge the sufficiency of the evidence supporting their convictions for murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(l) (Counts Four and Five respectively).

To prove a substantive RICO violation, as charged in Count One, the government must show, *inter alia*, that a defendant participated in the conduct of the affairs of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To show such a pattern, the government must prove at least two predicate racketeering acts that "amount to or pose a threat of continued criminal activity," and are "related." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The predicate racketeering acts must be related both "to each other ('horizontal' relatedness), and . . . to the enterprise ('vertical' relatedness)," *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016) (quoting *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992)). The relatedness of predicate acts may be shown by evidence that the acts have "the same or

similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *United States v. Payne*, 591 F.3d 46, 64 (2d Cir. 2010) (quoting *H. J. Inc.*, 492 U.S. at 240) (internal alterations omitted). "'[T]he same or similar proof that establishes vertical relatedness' may also establish horizontal relatedness, because 'the requirements of horizontal relatedness can be established by linking each predicate act to the enterprise.'" *Vernace*, 811 F.3d at 616 (quoting *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) *(per curiam)* (alterations adopted).

The RICO conspiracy statute charged in Count Two, 18 U.S.C. § 1962(d), provides, simply, that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To be guilty of such a conspiracy, one must agree with others to participate in the conduct of the affairs of the enterprise and agree that the conduct of the affairs of the enterprise will include the predicate racketeering acts alleged. *United States v. Basciano*, 599 F.3d 184, 199 (2d Cir. 2010). The RICO conspiracy provision is broader than the general conspiracy provision

applicable to federal crimes, 18 U.S.C. § 371, as it does not require the commission of an overt act. *See Salinas v. United States,* 522 U.S. 52, 63 (1997).

To prove murder in aid of racketeering, as charged in Counts Four and Five, the government must show that a defendant committed murder "for the purpose of gaining entrance to or maintaining or increasing position" in the racketeering enterprise. 18 U.S.C. § 1959(a)(l). That intent requirement can be proven by a showing "that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Pimentel,* 346 F.3d 285, 296 (2d Cir. 2003) (internal quotation marks omitted).

Laurent and Ashburn were also charged with murder in aid of racketeering based on the conduct underlying two of the alleged Racketeering Acts. All three Defendants contend that there was insufficient evidence to prove several of the underlying Racketeering Acts; Laurent and Ashburn additionally contend that there was insufficient evidence to show murder in aid of racketeering.

We address their challenges in turn.

**A.**   <u>Laurent</u>

Laurent's substantive RICO conviction charged in Count One was based on eight predicate Racketeering Acts. Laurent first contends that there was insufficient evidence to prove that Racketeering Acts Five, Six, Eight, and Nine (charging Hobbs Act robbery, Hobbs Act robbery conspiracy, and state law robbery) were "vertically" related to the enterprise. Those Racketeering Acts are Laurent's thefts from individuals he sought out through internet marketplace websites on several occasions between June 2010 and October 2010.

The evidence at trial showed that, in the late spring or early summer of 2010, shortly after he became a Six Tre member, Laurent asked an acquaintance, Keegan Estrada (who was not a Six Tre member), to participate with him in a robbery scheme. Estrada testified that on five occasions he and Laurent targeted persons who were using internet communications to solicit purchasers or sellers of cell phones (or other such goods), lured them to a meeting place, and robbed them using knives or guns (or attempted to do so). On one occasion, another Six Tre member, Ricky Hollenquest, assisted Estrada and Laurent in the robbery. Hollenquest continued to work with

Estrada to commit additional such robberies after Laurent ceased participating in the scheme.

The evidence showed that at least two other Six Tre members, on multiple occasions, committed or attempted to commit similarly staged armed robberies of cell phones. Relatedness was further supported by evidence that Six Tre members advanced their standing in the Gang through committing acts of violence and making money for the Gang. We conclude that the evidence of motive, participation of multiple gang members, and similarities between these robberies and those committed by other similarly situated gang members, although not overwhelming, was sufficient to support the inference that Laurent's robberies were a Gang-related activity. *See Payne,* 591 F.3d at 64. We recognize that Estrada was not a Gang member and testified that he had no information leading him to believe that the robberies were connected to the Gang. Nonetheless, while those facts might have persuaded jurors to find otherwise, they do not render the evidence supporting relatedness legally insufficient to prove such a connection.

In a *pro se* supplemental brief Laurent argues that Racketeering Act Four — his murder of Brent Duncan — was "purely personal" and not related

to the activities of the Gang. Laurent Supp. Pro Se Br. 3. In his counseled brief he similarly challenges the sufficiency of the evidence supporting his conviction on Count Five for the same murder in aid of Racketeering. Laurent does not dispute the sufficiency of the evidence to prove that he killed Duncan. His argument is rather that the evidence was insufficient to support the inference that the Gang authorized the killing or had advance knowledge of the plan to commit it, or that the killing was committed with the purpose of maintaining or increasing Laurent's status in the Six Tre. These arguments are not persuasive.

Testimony of cooperating witnesses showed that Laurent believed that Duncan was a member of the rival Crips gang and, there was ample evidence showing that violence by Laurent against Crips members was related to his membership in the Six Tre. Laurent was a former Crips member who left the Crips to join the Six Tre in the spring of 2010, causing the outbreak of a "little war" between the rival gangs. Merritt App'x at 1066–67. Laurent shot and killed Duncan following a fight. He then bragged to a Six Tre member about the killing. *Id.* at 1268. On another occasion, Laurent said to Six Tre members that "[a]ll Crips must die." *Id.* at 1264.

13

There was also evidence that Laurent attempted multiple murders of other members of the rival Crips gang. That evidence was consistent with testimony that Six Tre members considered it their duty to commit violence, including murder, against rival gang members. Such evidence supported the conclusion that violent acts against Crips were "expected of him by reason of his membership in the enterprise or . . . committed . . . in furtherance of that membership," — as is necessary to support Laurent's conviction on the Count Five charge of murder in aid of racketeering. *Pimentel,* 346 F.3d at 296 (citations omitted). Taken together, the cited evidence was sufficient to permit a reasonable jury to find that the killing of Duncan was "related" to the Six Tre enterprise, *Payne,* 591 F.3d at 64, and was committed "in aid of racketeering," *Pimentel,* 346 F.3d at 296. Furthermore, in view of the evidence that Six Tre members increased their standing in the Gang through acts of violence and that other Six Tre members also sought to kill Crips, the absence of evidence that Six Tre members authorized or even knew about Laurent's intention to kill Duncan before he did so is not inconsistent with a conclusion that the killing was related to and motivated by Laurent's Six Tre membership.

With respect to his conviction on Count Two for RICO conspiracy, Laurent makes the same insufficiency of evidence arguments that he asserts against his substantive RICO conviction under Count One, and accordingly we reject his arguments for the same reasons. We affirm Laurent's convictions on Counts One, Two, and Five.

**B.**    <u>Merritt</u>

With respect to Merritt's Count One substantive RICO conviction, Merritt challenges the sufficiency of the evidence to support the four alleged predicate Racketeering Acts: Racketeering Acts One, Ten, Eleven, and Twelve.

We discuss first Racketeering Acts Ten, Eleven, and Twelve, which charged separate acts of state law robbery, robbery conspiracy, attempted robbery, and felony murder (of Dasta James), which arose out of a planned robbery. With respect to these, making arguments similar to Laurent's arguments reviewed above, Merritt challenges the sufficiency of the evidence supporting their relatedness to the Six Tre. He contends that these "were quintessential street crimes of opportunity," unrelated to his membership in the Gang or to a pattern of racketeering activity. Merritt Br. 22. We reject his argument.

Merritt's robberies charged in Acts Ten and Eleven involved threats of violence to steal cell phones and other personal property from two individuals on a street close to the Ebbets Field housing complex ("Ebbets Field"). As discussed above in connection with Laurent, there was parallel evidence showing that other Six Tre members committed multiple similarly orchestrated robberies of cell phones, and that such robberies were among the ways that Six Tre members increased their reputation and status within the Gang.

Act Twelve involved a meeting set up by Merritt with Dasta James at James's apartment in Ebbets Field ostensibly to purchase marijuana. Before the meeting, Merritt met with another individual, who told Merritt that he planned to use the meeting to rob James.[4] During the meeting, James was shot and killed, and video surveillance showed Merritt fleeing the apartment. Following his arrest, Merritt told a police officer that the other individual was the shooter. Because Six Tre foot soldiers would commit such robberies and killings to increase their personal status within the Gang and the Gang's

---

[4] The "other individual" named in the record was in fact Laurent. In order to comply with *Bruton v. United States*, 391 U.S. 123 (1968), the evidence presented to the jury did not name Laurent. Laurent's *Bruton* claim is discussed below.

status vis-à-vis other gangs and because there were multiple instances of Six Tre members using an appointment to buy or sell property as a set-up for a violent robbery, a juror could reasonably conclude that Merritt 's participation was related to his membership in the Six Tre.

Racketeering Act One under Count One alleged a conspiracy to kill members of the Crips gang. Merritt contends that evidence was insufficient to show that he joined in such a conspiracy. He contends that the government impermissibly relies on a presumption that membership in the Six Tre necessarily indicated a commitment to murder Crips. His characterization of the government's evidence is, however, inaccurate.

The evidence showed that in August 2008, Duls, a high-ranking Six Tre member, reported to members of the Gang that he was robbed by a member of the Crips. That day, Merritt, together with other Six Tre members including Duls, went into Crip territory planning to commit "violence" against Crips. Merritt App'x at 683. While Merritt eventually left after the group failed to find any Crips, later that night, Duls found and killed the Crips member who he believed had robbed him. The government did not rely on a presumption based on mere membership in the Six Tre. The evidence explicitly showed

that Merritt was part of a group of seven Six Tre members who went out on an expedition to find Crips and do violence against them to avenge the robbery by a Crips member of a Six Tre member, which ultimately resulted in the killing of a Crip.

Merritt's challenge to the sufficiency of the evidence to support his conviction on Count One fails. His challenge to the sufficiency of the evidence supporting his RICO conspiracy conviction (Count Two) relies on the same arguments and therefore also fails.

**C.**     Ashburn

Ashburn likewise challenges the sufficiency of the evidence to support his substantive RICO conviction (Count One) and his conviction for RICO conspiracy (Count Two). Both charges were predicated on Racketeering Acts One and Two, which alleged conspiracy to murder Crips and the murder of Courtney Robinson. He contends, *inter alia*, that the evidence was insufficient to support either of those predicate racketeering acts.

1.     Count One - Predicate Act One: Six Tre Conspiracy to Murder Crips.

We address first the substantive RICO charge (Count One) and predicate Racketeering Act One, alleging that Ashburn conspired with other

Six Tre members to kill Crips. Although there is no evidence that Ashburn personally participated in the murder of Crips or in conversations explicitly about killing Crips, we find the evidence sufficient to support the jury's finding that he agreed with other Six Tre members that Gang members would kill Crips. The essential pieces of evidence supporting that conclusion are as follows.

- Ashburn was the principal boss of the Six Tre gang, known as the "Big Homie." As such, he was at the top of the Six Tre chain of command.

- It was part of the understanding within the gang that the Big Homie "need[ed] to know what's going on, the ins and outs of situations." Merritt App'x at 604.

- Ashburn led Six Tre initiates in a loyalty pledge. Six Tre member Kevin Bell, one of the initiates who recited the pledge, testified that the duties of members included "everything up to killing" rivals of the Six Tre and that members would increase their status within the Six Tre by doing violence against those rivals. Merritt App'x at 662-63 According to Bell, "if one of [the Six Tre]

19

members had a rival, that was my rival as well" and members agreed to do "[e]verything up to killing" rivals. Merritt App'x at 663.

- When Duls, a Six Tre member, was robbed in 2008 by a Crip, numerous members of the Six Tre went out with Duls into Crip territory to do violence against Crips, resulting in the killing by Duls of the Crip who had robbed him. Bell testified that the rivalry with the Crips continued beyond the Duls event.

- On another occasion, D-Bloc, another Six Tre leader, told members to go to Franklin Avenue to fight with Crips.

- In 2010, "a little war" broke out between the Six Tre and the Crips as the result of Laurent abandoning his Crips membership to join the Six Tre. Merritt App'x at 1066. Multiple Six Tre members participated in attempts (some successful) to kill Crips.

- On another occasion that was testified to by Keegan Estrada, an associate of Six Tre members Laurent and Hollenquest, Laurent learned that a Crips leader called BonTon had attempted to shoot Hollenquest. Laurent declared, "All Crips must die," and that

20

"they're going to shoot on sight at any Crip member." Laurent App'x at 450.

- When a fight broke out at a party between Dewan, a Six Tre affiliate who soon thereafter became a member, and Omar, who was not affiliated with the Six Tre, Ashburn himself, along with numerous Six Tre members, joined in the fight, beating, kicking, and stomping Omar. Ashburn then, accompanied by other Six Tre members, fetched a gun from a Six Tre hiding place and killed Omar's uncle, Courtney Robinson, who had entered the fight to protect Omar, with a shot fired at point blank range.

- On another occasion, Ashburn gave express approval for the murder of a member of the rival Bloods gang.

We conclude that the evidence was sufficient to support the jury's finding that it was the understanding of the Six Tre conspiracy in which Ashburn joined that members of the Six Tre enterprise would kill Crips if and when the Crips became hostile rivals of the Six Tre gang. The evidence supports the inference that Ashburn was aware of and supported the Six Tre credo that members should inflict violence on and kill members of rival

gangs. The supporting evidence included Ashburn's conduct, including his express authorization of killing a member of a rival gang, and his personal participation in the killing of one who fought with Six Tre members. The jury could further infer from the evidence that the Big Homie "need[ed] to know what's going on," that, when lasting hostilities, including plans to murder, broke out between the Six Tre and the Crips, Ashburn, as the principal leader of the Gang, was aware of it. In any event, although it is unnecessary to rely on it, Ashburn's endorsement of a conspiratorial understanding that Six Tre members should kill members of rival gangs is sufficient to encompass the application of that principle to the killing of Crips when that gang became a hostile rival. A gang leader who endorses a conspiratorial understanding that members may kill persons in a broad, targeted category should not escape liability for a charged conspiracy with an objective to kill a specifically identified person falling within that broad, targeted category that he agreed to. The illegal objective of the defendant's agreement encompasses the more detailed specification alleged.

2. <u>Count One - Predicate Act Two: The Murder of Courtney Robinson</u>

Ashburn also contests the sufficiency of the evidence to support the jury's verdict that he committed Racketeering Act Two of Count One, which charged that he, "acting together with others, with intent to cause the death of another person, to wit: Courtney Robinson, did cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00."

Robinson was killed on April 20, 2008, at a crowded party attended by Ashburn and other Six Tre members at Ebbets Field. Two witnesses testified: Corretta Thompson, the owner of the apartment where the party took place, and Kevin Bell, a person who was newly inducted into the Six Tre at the party that evening. Their testimonies established the following.

During the party, Ashburn brought a group of new Six Tre inductees into a room in Thompson's apartment and conducted an induction ceremony in which he administered the oath of admission into the Gang. As part of the ceremony, Ashburn required inductees to pledge loyalty. Bell was led to understand that "if one of [the Six Tre] members had a rival, that was my rival as well" and that in being a member, one agreed to do "[e]verything up to killing" rivals of the Gang. Merritt App'x at 663.

As partially recounted above, later that night, a fight broke out between Dewan, who was allied with the Six Tre and would become a member a few months later, and Omar, who was not affiliated with the gang. Six Tre members, including Ashburn and Bell, joined in the fight against Omar. The fight moved from the apartment out into the hallway, where Ashburn and other Six Tre members beat, stomped on, and kicked Omar, who had been knocked to the ground. Courtney Robinson, who was Omar's uncle, joined the fight on Omar's side, wielding a liquor bottle, trying to hit Omar's Six Tre assailants with it. Omar was able to escape back into the apartment.

Ashburn, together with other Six Tre members, was seen by Thompson running from the crowd toward a room next to the stairwell and incinerator shaft where, according to Bell, Six Tre members hid weapons. Ashburn was then seen by Bell running back from the stairwell area toward the fight. Bell saw that Ashburn was holding a gun under the sleeve of his hoodie. Moments later, Bell heard a shot fired (without seeing who had fired it) and then saw that Robinson had been shot. There was no evidence of the presence of any other gun than the one Ashburn was carrying as he ran back toward the melee. Cooj, one of the Six Tre members who had run with Ashburn to the

stairwell where the Six Tre kept hidden guns, said on observing Robinson's body, "[W]e shoot the wrong somebody." Merritt App'x at 370. A forensic pathologist testified that Robinson's gunshot wound was a contact entrance wound — meaning that the muzzle of the gun was very close to Robinson's skin when it was fired.

Racketeering Act Two alleged a violation by Ashburn of New York Penal Law Sections 125.25(1) and 20.00. A defendant is guilty of violating § 125.25(1) when, "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N.Y.P.L. § 125.25(1).

Ashburn argues that the evidence was insufficient to show both that it was he who killed Robinson and that, even assuming he did, he acted with the required state of mind of intent to cause death. He stresses that no one testified to having seen him shoot Robinson. We nonetheless conclude that the jury could reasonably find beyond a reasonable doubt that it was Ashburn who shot Robinson and did so with intent to kill.

After fighting with Robinson outside the apartment, Ashburn ran, accompanied by other Six Tre members, to the place where the Six Tre hid guns and then ran back toward the fight carrying a gun moments before the

shot was fired that killed Robinson. The statement of Six Tre member Cooj, who accompanied Ashburn on the run that "[w]e shoot the wrong somebody," appears to acknowledge implicitly that Robinson was killed by a Six Tre member. Considering the totality of the evidence reviewed above, we conclude that a jury could reasonably find beyond a reasonable doubt that the person who fired the shot was the one who had just been involved in the fight, ran to a place where guns were hidden, and returned to the fight carrying a gun, which was in his hand seconds before the firing of the shot that killed Robinson.

The evidence also strongly supports the inference of Ashburn's intent to kill. Moments before the shooting Ashburn had been one of a group of Six Tres fighting with Robinson who had attacked them with a liquor bottle, and Ashburn had run from the fight to a place on the landing where his Gang hid guns and back to the fight, carrying a gun largely hidden under his sleeve. The testimony of the forensic expert established, furthermore, that the fatal shot was fired into Robinson's back "[w]ith the muzzle of the gun being up very close to the skin at the time that it is fired," Ashburn App'x at 78, effectively dispelling any realistic possibility that Ashburn used the gun

solely for the purpose of intimidating Robinson or intending to cause only a minor injury. The inference of Ashburn's intent to kill was further supported by the evidence that Six Tre members considered it their duty to kill rivals and increased their standing in the Gang by doing so.

Finally, Ashburn argues that the government's evidence should be discredited because there were inconsistencies between the testimonies of Bell and Thompson, and Bell's testimony was internally inconsistent. We reject the argument. The inconsistencies were minor and inconsequential.[5] They were not of the sort that suggests that a witness was either fabricating or mistaken as to the main thrust of the testimony. Minor inconsistencies between the observations and recollections of different witnesses testifying honestly are virtually inevitable and do not suggest lack of credibility. In any event, defense counsel strenuously argued to the jury that they should reject the government's proof on the basis of those inconsistencies and the jury rejected

---

[5] For example, Ashburn notes that Thompson testified that the party where Robinson was killed was thrown for Thompson's niece Melissa on the occasion of Melissa's birthday, but that Bell's testimony did not mention Melissa. Ashburn also argues that Bell's testimony that Ashburn conducted the Six Tre initiation ceremony himself was inconsistent with his testimony that Ashburn had previously lost standing within the Gang when he lost a fight to another Six Tre leader — D-Bloc — who attended the initiation ceremony but did not speak. But there is nothing literally irreconcilable about these two pieces of testimony.

that argument. We conclude that Racketeering Act Two as charged against Ashburn was adequately supported by the evidence.

### 3. Count Two: RICO conspiracy

For similar reasons, we find the evidence sufficient to support Ashburn's conviction on the RICO conspiracy count (Count Two). Where, as here, the RICO enterprise in question already exists so that the conspiracy does not concern the establishment of a new enterprise, to prove RICO conspiracy the government must prove that the defendant agreed with others to participate in the conduct of the affairs of the enterprise and that the affairs of the enterprise would include the acts charged as predicate acts of racketeering. *See Basciano*, 599 F.3d at 199 (To prove a RICO conspiracy, the government must prove "that a defendant agreed with others (a) to conduct the affairs of an enterprise (b) through a pattern of racketeering.").

The evidence satisfied those requirements. It unquestionably established that Ashburn agreed to participate in the Six Tre gang. He not only agreed to participate in the Six Tre, but he did so as its primary leader during the relevant period, leading new initiates in reciting a pledge of loyalty to the Gang. And the evidence supported the jury's finding of his

agreement that the conduct of the affairs of the Six Tre encompassed murder of rival gangs, which would include Crips, and the murder of Courtney Robinson. The evidence was sufficient to sustain Ashburn's conviction on Count Two.

### 4. Count Four: Murder in Aid of Racketeering

Finally, Ashburn challenges his conviction for the murder of Courtney Robinson, in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1).[6] To sustain the conviction, the government needed to prove that Ashburn intended to and did cause Robinson's death to "gain[] entrance to or maintain[] or increas[e] position in an enterprise engaged in racketeering activity." We conclude that the evidence was sufficient.

Ashburn contends, first, that there was insufficient evidence to establish that he murdered Robinson in violation of New York Penal Law Sections 125.25(1) and 20.00. However, as has been discussed extensively above, we reject that contention.

---

[6] 18 U.S.C. § 1959(a)(1) makes it a federal crime, punishable by death or life imprisonment, to commit "murder[] . . . in violation of the laws of any State or the United States" where such murder is committed "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."

Ashburn also argues that the government failed to establish that the killing was "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." Ashburn contends that the murder "was an unplanned act, stemming from a personal fight that spun out of control." Ashburn Br. 33.

His argument is not persuasive. To support a conviction for murder in aid of racketeering, the government need not "prove that maintaining or increasing [the defendant's] position in the RICO enterprise was the defendant's sole or principal motive." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992). It is sufficient for the government to prove that the killing was "expected of [the defendant] by reason of his membership in the enterprise or . . . committed . . . in furtherance of that membership." *Pimentel*, 346 F.3d at 296. There was substantial evidence that Six Tre members considered it their duty to undertake violence — up to and including murder — against the perceived enemies of the Gang or in defense of Gang members and allies.

The fight that resulted in Robinson's death was shown to be a Six Tre cause. It occurred at a party at which many partiers were Six Tre members

and a Six Tre induction ceremony was conducted. A fight broke out between Dewan, a Six Tre affiliate, and Omar, who was not connected to the Six Tre. Robinson, who was Omar's uncle, joined the fight on Omar's side wielding a liquor bottle, and numerous Six Tre members, including Ashburn, the leader of the Six Tre, joined the fight on their affiliate's side. Ashburn, accompanied by several Six Tre members, ran to the place near the stairwell where the Six Tre kept hidden weapons and returned to the fight with a gun, then shooting and killing Robinson. The remark of Six Tre member Cooj that "[w]e shot the wrong somebody," apparently meant that the "we" who had done the shooting was the Six Tre. Moreover, Bell had testified that sometime before the party, Ashburn had lost a fight to another Six Tre. From this evidence, in ruling on Ashburn's motion to dismiss, the district court had drawn the inference that the loss had caused Ashburn a loss of status and motivated him to reinforce his status by killing a Six Tre rival. The jury could have drawn the same inference. The evidence that Ashburn's motive in shooting and killing Robinson derived from the fact that Omar and Robinson were fighting against Six Tre interests, that Ashburn was the leader of the Six Tre who had recently suffered a loss of stature, that Six Tre members have a duty to treat

the rival of one as the rival of all, and that Six Tre members increase their standing within the enterprise by killing rivals all supports the conclusion that the killing was done for the purpose of maintaining and increasing Ashburn's position in the enterprise.

We do not dispute Ashburn's contention that the killing was spontaneous and not previously planned. Those facts, however, are in no way inconsistent with the jury's finding that one motive for the killing was to maintain or increase position within the Six Tre. The evidence strongly supported the inference that, in the circumstance where Six Tres were engaged in a fight with outsiders, it would have been a dereliction of duty for members (and especially for the leader) to fail to come to their support and vindication. We reject Ashburn's challenge to his conviction under § 1959(a)(1).

**II.    Challenges to Convictions for the Use of a Firearm in a Crime of Violence**

All three defendants challenge convictions imposed under 18 U.S.C. § 924(c) for use of a firearm during and in relation to a crime of violence. All three challenge their Count Three convictions, and Laurent further challenges his convictions on Counts Seven and Ten. As relevant here, § 924(c) prohibits

the use of a firearm "during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States." *Id.* § 924(c)(l)(A). "Crime of violence" is defined under the statute "in two subparts—the first known as the elements clause, and the second the residual clause." *United States v. Davis*, 139 S. Ct. 2319, 2324 (2019). Under the elements clause, also known as the force clause, a crime of violence is a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). Under the residual clause, a crime of violence is a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id.* § 924(c)(3)(B). As has been extensively recounted elsewhere, in *United States v. Davis* the Supreme Court held that the residual clause of § 924(c)(3)(B) is unconstitutionally vague.[7] *Davis*, 139 S. Ct. 2319, 2336 (2019); *see also United States v. Capers*, 20 F.4th 105, 117 (2d Cir. 2021); *United States v. Heyward*, 3 F.4th 75, 81 (2d Cir. 2021); *United States v. Martinez*, 991 F.3d 347, 350 (2d Cir. 2021). Thus, to sustain the Defendants' § 924(c) convictions, we

---

[7] Following the Court's decision in *Davis*, we ordered the parties to submit supplemental briefing addressing whether, and how, the decision affected this appeal.

must find that their predicate offenses are crimes of violence under the elements clause.

In determining whether a predicate offense is a crime of violence under that clause, we use the "categorical approach," looking to "the intrinsic nature of the offense rather than [to] the circumstances of the particular crime." *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006) (per curiam) (internal quotation marks omitted). We identify "the minimum criminal conduct necessary for conviction" to determine whether it requires the use of force. *Id.* Under that approach, a reviewing court "cannot go behind the offense as it was charged to reach its own determination as to whether the underlying facts" qualify as a crime of violence. *Id.* (quoting *Ming Lam Sui v. INS*, 250 F.3d 105, 117–18 (2d Cir. 2001)) (internal alteration omitted). The fact that force or violence was used in the commission of the offense is irrelevant to whether it is deemed a crime of violence for purposes of § 924(c). *See Martinez*, 991 F.3d at 353 ("[A] crime is covered . . . only if it *categorically*, that is to say, in every instance by its very definition, involves the use of force.").[8]

---

[8] A § 924(c) conviction can also be "premised on a drug trafficking crime, including conspiracies." *Heyward*, 3 F.4th at 81. This alternate permissible § 924(c) predicate is not relevant here, because Count Three was charged and presented to the jury only on the basis of predicate "crimes of violence," not drug trafficking crimes.

Where, however, a criminal statute sets forth any element of the offense *in the alternative*, such that the minimum elements of conviction can be proven in discrete ways,[9] some necessarily requiring the use of force and some not, the statute may be deemed "divisible." For divisible statutes, the Supreme Court has approved the use of what courts call the "modified categorical approach." *See Descamps v. United States*, 570 U.S. 254, 257 (2013); *Shepard v. United States*, 544 U.S. 13 (2005); *Taylor v. United States*, 495 U.S. 575 (1990); *see also Martinez*, 991 F.3d at 354. "Under the modified categorical approach, a court looks to the charging instrument or other authoritative documents to determine whether a defendant *necessarily* was charged with or convicted of a crime involving the use of force under the subsection." *Martinez*, 991 F.3d at 354.

**A.**    Count Three — Firearms Violation Predicated on Substantive RICO and RICO Conspiracy

Count Three charged that each of the Defendants "did knowingly and intentionally use and carry one or more firearms during and in relation to one

---

[9] In *Martinez,* this Court provided a useful example of such a crime: "Suppose the statute defined child endangerment as '(1) committing aggravated battery against a child less than seventeen years old *or* (2) otherwise knowingly acting in a manner likely to be injurious to such a child.' And suppose that an indictment specifically charged a defendant with violating subsection (1) of that statute." *Martinez*, 991 F.3d at 354.

35

or more crimes of violence, to wit: the crimes charged in Counts One and Two, and did knowingly and intentionally possess such firearms in furtherance of said crimes of violence, one or more of which firearms was brandished and discharged." Merritt App'x at 193. Again, Counts One and Two referenced in Count Three charged, respectively, a substantive violation of RICO, 18 U.S.C. § 1962(c), and a conspiracy to violate RICO, 18 U.S.C. § 1962(d).

Relying on prior pre-*Davis* precedent, the trial court assumed that substantive RICO offenses and a RICO conspiracy offense are both crimes of violence if based on predicate offenses that required use of force. Because the trial court understandably believed that Counts One and Two both could qualify as crimes of violence, it did not instruct the jury to specify, upon finding guilt on Count Three, whether the finding was based on a substantive violation, as charged in Count One, or on a conspiracy, as charged in Count Two. No defendant objected to the court's presenting Count Three to the jury on that basis. The jury found all three defendants guilty on Count Three without specifying whether the crime of violence on which it relied was the crime charged in Count One, Count Two, or both. We are thus unable to

determine whether the jury's finding of a crime of violence was predicated on the substantive RICO offense, the RICO conspiracy, or both.

Since the trial, however, it has been established that a RICO conspiracy cannot qualify as a crime of violence, even if marked by violence or directed to violent objectives. This is because the crime of conspiracy is completed upon mere reaching agreement, so that the crime can be committed without use of force. *Capers*, 20 F.4th at 117-18. The government does not contend otherwise. Accordingly, the crime charged in Count Two was not a crime of violence, so that the convictions on Count Three cannot stand on the basis of Defendants having used or carried a firearm during and in relation to the conspiracy offense charged in Count Two.

The Supreme Court made clear in *Yates v. United States*, 354 U.S. 298 (1957) that a jury verdict constitutes legal error when a jury, having been instructed on two disjunctive theories of culpability, one valid and the other invalid, renders a guilty verdict in circumstances that make it impossible to tell which ground the jury selected. *See also Capers*, 20 F.4th at 126-28 (vacating a defendant's § 924(c) conviction based on a *Yates* error); *United States v. Agrawal*, 726 F.3d 235, 250 (2d Cir. 2013). Because Count Three allowed the

jury to find the essential element of a crime of violence based on either a substantive RICO offense or the RICO conspiracy, which cannot constitute a crime of violence, the entries of the guilty verdicts on Count Three were legal error.

We have held, however, that such errors of the *Yates* variety are subject to harmless error analysis. Furthermore, because the defendants made no objection at trial to the jury instruction that permitted the jury to convict them on Count Three based on Count Two, plain error review applies. *See United States v. Eldridge*, 2 F.4th 27, 38 (2d Cir. 2021) ("T]his [plain-error] approach to Yates errors applies . . . when there has been instructional error on one or more predicate offenses for a § 924(c) firearms charge."). Where a jury's finding of guilt, based on a predicate that cannot lawfully sustain guilt, nonetheless necessarily required that the jury have found facts satisfying the essential elements of guilt on the alternative charged predicate that would sustain a lawful conviction, we have found the error to be harmless. *See United States v. Zvi*, 168 F.3d 49, 56 (2d Cir. 1999); *United States v. Vasquez*, 672 F. App'x 56, 60-61 (2d Cir. 2016) (summary order). Notwithstanding the error in the Count Three verdict, those convictions can nonetheless be sustained if

the government prevails in showing that the error was harmless or the defendant fails to show that it met the plain error standard. The two questions are closely related and turn to some degree on similar factors.

Under plain error review, we consider whether "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Capers*, 20 F.4th at 116 (quoting *Martinez*, 991 F.3d at 351).

The first two requirements are satisfied in light of our ruling in *Capers* that a RICO conspiracy is not a crime of violence. *Cf. Eldridge*, 2 F.4th at 37-38 (conviction on § 924(c) count for which Hobbs Act robbery conspiracy was a predicate presented an error that became plain after *Davis*). As to the third and fourth requirements, "to have impacted [Defendants'] substantial rights and the fairness, integrity or public reputation of the judicial proceedings, the overall effect of the . . . error must have been sufficiently great that there is a reasonable probability that the jury would not have convicted . . . absent the

error." *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010).[10] If we can be "confident that the jury [would have] convicted" in the absence of the error, the error does not meet the plain error standard. *Capers*, 20 F. 4th at 128.

Although a conviction under § 924(c) cannot stand if its requirement of a crime of violence was met by a conspiracy, such an error does not violate the defendants' substantial rights under the plain error standard if the evidence left no reasonable doubt that the jury would have convicted under a proper instruction. *See, e.g.*, *Eldridge*, 2 F.4th at 40 (affirming conviction upon finding "no doubt that the jury" would have found guilt on proper instructions). *Compare Capers*, 20 F. 4th at 128 (vacating conviction where "the evidence presented . . . was sufficient to permit a properly instructed jury to convict[,]" but it was nonetheless "impossible to be confident that the jury convicted [the defendant] on an appropriate set of findings.").

---

[10] *Eldridge* noted that our Circuit has used "different verbal formulations" in describing the standard for whether a defendant's substantial rights have been affected by an erroneous jury instruction under plain-error review, i.e., whether there is a "reasonable probability" that the error affected the outcome, or whether "the jury would have returned the same verdict beyond a reasonable doubt." *Eldridge,* 2 F.4th at 39 n.16 (quotation marks omitted). As the panel explained, there does not appear to be "an appreciable different between these standards, in practice, as 'a reasonable probability' that the error affected the outcome of the trial would seem to encompass whether a jury could have formed 'reasonable doubts' absent the error." *Id.*

Because Count Three predicated the firearms crime on *both* the RICO conspiracy charge in Count Two *and* the substantive RICO charge in Count One, any error in allowing the jury to consider the RICO conspiracy a crime of violence would not have affected Defendants' substantial rights and the fairness, integrity, and public reputation of the judicial proceedings if we can be confident that the jury would have convicted them on Count Three even if that error had not been committed. Whether we can have such confidence depends in turn on whether (i) it was not error to allow the jury to find that the substantive RICO violation charged in Count One was a crime of violence satisfying the requirements of § 924(c), and (ii) we can be confident, based on the verdict returned by the jury, that the jury would have found Defendants guilty on Count Three if properly instructed that that finding could be based only on Defendants' use of a firearm during and in relation to committing crimes of violence charged as RICO predicates in Count One.

As to point (i), we conclude that the district court did not err in instructing the jury that a substantive RICO violation can be a crime of violence for the purpose of § 924(c). In *United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009), we applied what we then characterized as the "categorical

approach" to determine whether a substantive RICO offense was a "crime of violence" for purposes of § 924(c). We rejected the argument, also made by the defendants, that, because a violation of RICO can be predicated on racketeering acts of a nonviolent nature, [11] a substantive RICO violation cannot be a "crime of violence." *Id.* at 95. We held that, "[b]ecause racketeering offenses hinge on the predicate offenses comprising the pattern of racketeering activity, we look to the predicate offenses to determine whether a crime of violence is charged." *Id.* at 96. Although the *Ivezaj* opinion said it was applying the categorical approach, its analysis in fact was much closer to the *modified* categorical approach, insofar as the court held that determining whether a substantive RICO conviction is a "crime of violence" requires looking to the particular predicate racketeering acts underlying the conviction. *Id.*

The defendants argue that, after *Davis*, *Ivezaj*'s approach is no longer good law. We disagree. While recognizing that the Supreme Court has not ruled on whether a substantive RICO offense is a crime of violence when predicated on at least one violent racketeering act, we see nothing in *Davis*

---

[11] For example, 18 U.S.C. § 1961 defines "racketeering activity" to include such nonviolent acts as fraud, "gambling" and "bribery."

that suggests, much less compels, a rejection of our *Ivezaj* analysis.

Furthermore, the Supreme Court has repeatedly suggested that, when a statute is divisible in that it offers alternative possibilities for determining guilt, some of which are crimes of violence, some not, the court may consult such sources as the indictment and the plea allocution or the jury charge to determine whether the defendant was charged and convicted under the branch of the statute that qualifies as a crime of violence. *See Descamps*, 570 U.S. at 257; *Gray v. United States*, 980 F.3d 264, 266 (2d Cir. 2020). Unless the Supreme Court abandons the suggestions it made in these cases, we see no reason why RICO would not qualify for such an approach, deeming it a crime of violence when the defendant is charged under a predicate that is a crime of violence but not a crime of violence when the RICO charge is based on non-violent predicates.

We do not read the *Ivezaj* precedent as requiring two violent predicates. We see nothing in any of the pertinent statutes or judicial rulings that would require two violent predicates. If one of the two racketeering acts required for a substantive RICO violation conforms to the definition of a crime of violence,

we see no reason why the RICO violation would not qualify as a crime of violence.

This conclusion is compatible with our recent holding in *United States v. Martinez*. In that case, we held post-*Davis* that it was not plain error for a district court to have accepted a guilty plea to a violation of § 924(c) predicated on one substantive RICO conviction based in part on a predicate act that was a violent crime. *Martinez*, 991 F.3d at 359.[12] In fact, the *Martinez* court went further, holding that, even though *Ivezaj* had involved a substantive RICO violation with two violent predicates, it was not plain error for the district court to find that a substantive RICO violation was a crime of violence where one of its predicate racketeering acts was a crime of violence. *Martinez*, 991 F.3d at 356 ("[T]he reasoning of *Ivezaj* arguably supports a

---

[12] Our ruling differs from the ruling in *Martinez* in that the *Martinez* court found only that reliance on *Ivezaj* after *Davis* was not *plain error*, deeming it unnecessary to decide whether it was error at all to base a § 924(c) conviction on a substantive RICO charge. The opinion noted that, although § 924(c) sentences are by definition consecutive, Martinez's § 924(c) sentence had not added to the duration of his incarceration. That was because, following a negotiated plea agreement based on the defendant's total time of imprisonment, the sentencing court had determined the duration of the underlying predicate sentence so as to achieve the agreed total period of imprisonment after adding the mandatory consecutive sentence. It was clear that if a conviction under § 924(c) had been unavailable, the district court would have increased the duration of the sentence on the predicate count to achieve the same result. As a result, we could conclude in *Martinez* that the § 924(c) conviction, even if unlawful, did not affect substantial rights. We could not reach the same conclusion on this record.

conclusion that a RICO offense predicated on a pattern of racketeering that included one crime of violence would be a crime of violence under § 924(c).").We noted in *Martinez* that applying a modified categorical approach to a substantive RICO conviction makes good sense given that (1) RICO requires that the specific crimes constituting the "pattern" of the racketeering enterprise be identified in the charging instrument and proven beyond a reasonable doubt, and (2) sets forth distinct penalties for different categories of underlying violations. *Martinez*, 991 F.3d at 356-57.

As in *Martinez*, the substantive racketeering charges here were predicated on at least one crime of violence. In Ashburn's case, Racketeering Act Two supporting Count One alleged murder. For Laurent, the Racketeering Acts alleged in Count One included a murder (Racketeering Act Four), an attempted murder (Racketeering Act Seven), and multiple robberies (Racketeering Acts Six, Eight, and Nine). The Count One Racketeering Acts alleged against Merritt included two robberies (Racketeering Acts Ten and Eleven), and an attempted robbery resulting in felony murder (Racketeering Act Twelve). *United States v. Ashburn* (No. 11-CR-303 NGG), ECF 454.

Having concluded that the district court did not err in allowing the jury to find that a substantive RICO violation served as a crime of violence, we next turn to whether we can be confident that the jury's guilty verdicts on the § 924(c) counts were based on findings of fact that ensured that the jury would have found each defendant guilty on Count Three had the district court instructed that a conviction on a § 924(c) count could be based only on Count One (and not on Count Two).

The district court instructed the jury that, in order to establish guilt on Count Three, the Government must prove two elements beyond a reasonable doubt: (1) "that the defendant . . . committed a crime of violence" and (2) "that the defendant either knowingly and intentionally used or carried a firearm during and in relation to the commission of the crime of violence, or knowingly and intentionally possessed a firearm in furtherance of that crime, or aided and abetted another person in doing so." Final Jury Instructions at 70, *United States v. Ashburn* (No. 11-CR-303 NGG), ECF 425.

### 1. Ashburn's Count Three Conviction

Turning first to Ashburn's case, we can deduce that the jury found both of the elements necessary to convict on Count Three predicated on the

substantive RICO charge. The jury found Ashburn guilty of the murder of Courtney Robinson in rendering its verdict on Count One. In addition, the jury found Ashburn guilty of Count Four, which charged Ashburn with the same murder of Courtney Robinson in-aid-of racketeering. Robinson's murder was indisputably committed with a firearm, and the only pertinent evidence was the testimony of Coretta Thompson and Kevin Bell that during the fight with Robinson, who was slashing at Six Tres with a liquor bottle, Ashburn ran from the fight in the hallway outside Thompson's apartment to a room next to the stairwell where the Six Tre had guns and ran back hiding a gun under the sleeve of his hoodie seconds before Robinson was shot at point blank range. We thus know that the jury found facts constituting most of the elements of the crime charged in Count Three, including that Ashburn committed the crime of violence in the murder of Courtney Robinson, and that that crime was committed by the use of a firearm.

Furthermore, while the jury's verdict does not demonstrate with certainty that the jury found that Ashburn "used or carried a firearm during and in relation to the commission of the crime of violence" or "possessed a firearm in furtherance of that crime," the jury verdict together with the

evidence gives a very high degree of confidence that the jury so found. The apparent reason that Ashburn, accompanied by other Six Tres, ran away from the fight with Robinson to a room on the landing near the stairwell and then ran back was to get a gun for use in the fight with Robinson. It is difficult to posit a plausible theory on which the jury could have concluded beyond a reasonable doubt (as it did) that Ashburn was guilty of murdering Robinson in connection with his membership in the Six Tre without crediting Bell's testimony that Ashburn carried a gun in connection with that murder. We can thus be confident that, had the jury been instructed that it could base the § 924(c) charge only on Ashburn's substantive RICO offense, it would still have found Ashburn's guilt. Because the district court's *Yates* error did not affect Ashburn's substantial rights, we affirm Ashburn's Count Three conviction.

### 2. Laurent's Count Three Conviction

We can similarly conclude that Laurent's substantial rights were not affected by the *Yates* error. The jury found that Racketeering Act Four, the murder of Brent Duncan, was proved as to Laurent. The jury also found Laurent guilty of Count Five, which charged the murder of Duncan "for the

purpose of maintaining and increasing his position in the Six Tre Folk Nation."

The jury thus necessarily found that Laurent intended that Duncan be killed. As with the murder of Robinson, it is undisputed that Duncan was killed by a gun. The jury also heard eyewitness testimony from a cooperating witness, Joelle Mitchell, who stated that he observed a "little commotion between [Laurent] and this other guy." Merritt App'x at 1087. Mitchell testified that, following the "commotion," he watched as the individual got into a car and Laurent ran after him, firing shots.[13] Finally, the jury heard that police later recovered a handgun from Laurent's room, and a forensics ballistics analysis showed that the bullets fired from the gun matched those recovered from the scene of the Duncan murder. Thus, as with Ashburn, the jury's findings, combined with the overwhelming evidence that Laurent used a firearm in the commission of the murder, give us a high degree of confidence that a properly instructed jury would have found Laurent guilty of Count Three, based on Racketeering Act Four under Count One. Accordingly, we affirm Laurent's Count Three conviction.

---

[13] While Mitchell did not identify Duncan as "this other guy," the date, location, and vehicle model leave little room for doubt that Duncan was the individual he described.

### 3. Merritt's Count Three Conviction

We cannot be similarly confident that a properly instructed jury would have convicted Merritt on Count Three. The jury found that Merritt had committed four racketeering predicates that were charged under Count One. The jury may have based its Count Three § 924(c) conviction on Racketeering Act One, the conspiracy to murder Crips, which involved the use of guns. However, as noted above, conspiracy is not a crime of violence for purposes of § 924(c). *United States v. Barrett*, 937 F.3d 126, 130 (2d Cir. 2019). And we cannot be confident that the jury would have based a § 924(c) conviction on any of the remaining predicates. The jury found Racketeering Acts Ten and Eleven proved as to Merritt—the state law robberies of Keith Benjamin and Kareem Clarke, respectively. In both of those robberies, Merritt or an accomplice threatened to shoot the victim or gestured as if he had a gun in his pocket. However, the government cites no evidence that Merritt actually had a gun. Therefore, we cannot find that the jury would have based its Count Three conviction on either of these predicate acts.

The jury also found Racketeering Act Twelve proved as to Merritt in all three sub-parts—robbery conspiracy, attempted robbery, and the murder of

Dasta James, which was committed with a firearm. The jury also convicted Merritt on Count Twelve, which charged the same attempted robbery of James. Hypothetically, the jury could have based a Count Three conviction on Merritt's participation in that robbery. However, Count Thirteen charged Merritt under § 924(c) with using, carrying, or possessing a firearm during and in furtherance of the same attempted robbery, and the jury acquitted Merritt on that charge. The most plausible inference from that pattern of verdicts is that the jury found that Merritt committed the robbery but that the government had failed to prove his use, carriage, or possession of a firearm. We cannot conclude that a properly instructed jury would have found Merritt guilty of the § 924(c) charge based on any of the qualifying racketeering acts.

Accordingly, for Ashburn and Laurent, we confidently conclude that the jury would have convicted them of Count Three if properly instructed that the § 924(c) charge could be predicated only on Count One and not on Count Two. The *Yates* error did not affect the substantial rights of Ashburn or Laurent. As for Merritt, however, we cannot be confident that the jury would have found him guilty of Count Three if properly instructed. We therefore affirm Ashburn's and Laurent's Count Three convictions, but because the

error affected Merritt's substantial rights, we must vacate his Count Three conviction.[14]

**B.** Count Seven — Firearms Violation Predicated on Assault with a Dangerous Weapon in Aid of Racketeering

Count Seven charged Laurent under 18 U.S.C. § 924(c)(1)(A)(ii) with having "use[d] and car[ried] a firearm during and in relation to a crime of violence, to wit: the crime charged in Count Six." Count Six, in turn, charged

---

[14] We remand his case to allow the district court to revise the terms of his sentence in the event that the district court concludes that the elimination of the consecutive ten years of imprisonment that the district court added for the Count Three conviction requires adjustment of the sentences in order to produce a sentence that meets the purposes of sentencing. *See* 18 U.S.C. § 3553(a). Especially as it appears highly unlikely that the government will seek to retry Merritt on Count Three, we need not decide now whether such retrial would be permissible. The issue has not been briefed. There is a substantial argument that retrial should be barred by the rule of double jeopardy. Each of the four predicate racketeering acts to Count One on which a Count Three conviction would have been tried appears to have been concluded in Merritt's favor. As for Racketeering Act One, conspiracy to murder Crips, a conspiracy cannot qualify as a crime of violence. As for Racketeering Acts Ten and Eleven, involving the robberies of Keith Benjamin and Kareem Clarke, the government has failed to point us to evidence that would support the necessary finding that Merritt used or carried a firearm during and in furtherance of these crimes. If the government failed to introduce legally sufficient evidence of this element at trial, the Double Jeopardy rule denies the government a second opportunity to produce the evidence it failed to adduce at the first trial. As for Racketeering Act Twelve, alleging the robbery, attempted robbery, and murder of Dasta James, the jury's acquittal of Merritt on Count Thirteen (which charged the use of a firearm in connection with the same attempted robbery charged in that Racketeering Act) would appear to preclude retrial of Count Three to the extent predicated on that crime. Because the parties have not briefed the question whether our ruling should be to vacate the Count Three conviction with leave to retry that Count or to reverse the conviction with prejudice, as well as because it appears highly unlikely that the government will seek a retrial of Count Three, we make no ruling on the question. In the unlikely event that the government seeks a retrial and the defendant asserts the defense of double jeopardy, the district court can decide the issue in the first instance at that time.

Laurent with having "assault[ed] an individual . . . with a dangerous weapon, to wit: a firearm, in violation of New York Penal Law §§ 120.05(2) and 20.00, all in violation of 18 U.S.C. §§ 1959(a)(3) and 3551 *et seq.* The referenced New York assault statute, which is alleged in the charge to be a crime of violence, provides that a person commits assault in the second degree when "[w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."

Laurent contends that the crime defined in that New York statute does not require the force necessary to qualify as a "crime of violence" under the elements clause and is therefore not categorically a crime of violence because it can be committed indirectly, for example, through poisoning, without employing force.

We reject his argument. In *United States v. Walker*, we held that attempted assault under N.Y.P.L. § 120.05(2) necessarily and categorically requires the use of "physical force," and therefore qualifies as a "violent felony" under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(i) ("ACCA"). 442 F.3d 787, 788-89 (2d Cir. 2006) (per curiam). The ACCA's

definition of "violent felony" under § 924(e)(2)(B)(i) is identical, in relevant part, to the definition of "crime of violence" under § 924(c)(3)(A), at issue here. *Cf. United States v. Walker*, 595 F.3d 441, 443 n.1 (2d Cir. 2010) *("Walker II")* (holding that authority interpreting § 924(e)(2)(B) is persuasive in interpreting similarly worded definition of "crime of violence" under the United States Sentencing Guidelines). In analogous contexts, we have rejected a similar argument that an offense is not categorically violent because it can be accomplished through indirect means. *See United States v. Hill*, 890 F.3d 51, 59 (2d Cir. 2018) (holding that "physical force 'encompasses even its indirect application,' as when a battery is committed by administering a poison" (quoting *United States v. Castleman*, 572 U.S. 157, 170 (2014))); *see also Villanueva v. United States*, 893 F.3d 123, 130 (2d Cir. 2018) (rejecting the argument that Connecticut's first-degree assault statute is not categorically violent because it can be committed using a poisonous substance). The fact that Laurent's offense could be committed indirectly does not preclude its serving as a violent crime predicate for a § 924(c) conviction. We affirm Laurent's conviction on Count Seven.

**C.**     Count Ten — Firearms Violation Predicated on Conspiracy to Commit Hobbs Act Robbery

Count Ten charged Laurent under § 924(c) with having used and carried "one or more firearms during and in relation to a crime of violence, to wit: the crime charged in Count Nine. Count Nine, in turn, charged that Laurent did "conspire to obstruct, delay and affect commerce . . . by robbery . . .," in violation of the Hobbs Act, 18 U.S.C. § 1951(a). The robberies in question were those described above, which served as predicate racketeering acts under Counts One and Two.

Laurent contends that conspiracy to violate the Hobbs Act by robbery is not categorically a crime of violence under the elements clause, regardless of the use of violence in carrying out the objectives of the conspiracy, because the crime of conspiracy, which consists essentially of reaching an agreement with illegal objectives, can be accomplished without use of force. § 924(c)(3)(A). In *United States v. Barrett*, this Court determined (following the Supreme Court's decision in *Davis*) that Hobbs Act robbery conspiracy is not a crime of violence as defined by 18 U.S.C. § 924(c)(3)(A). 937 F.3d at 130. As the government concedes, *Barrett* controls the decision here. Accordingly, we reverse Laurent's conviction on Count Ten.

**III.    Additional Claims of Error**

The Defendants raise numerous additional claims of error. We address each in turn.

**A.    Laurent**

1.    Confrontation Clause Claim

Laurent contends that his Confrontation Clause rights were violated when the district court admitted statements made by Merritt, without his having the opportunity for cross-examination, and that the court erred by failing to sever him from a joint trial. His objections relate to statements Merritt made to a police officer following his arrest in the robbery and murder of Dasta James that identified Laurent as James's killer. While Merritt's actual statements did identify Laurent as the killer, the statements were not introduced in that form. To ensure compliance with *Bruton v. United States*, 391 U.S. 123 (1968) and its progeny, the officer who testified to the statements replaced Laurent's name with neutral phrases, such as "another individual," and "the other guy." Laurent was not charged in the robbery or murder of James. He nonetheless contends that it was obvious to the jury that his name was redacted from Merritt's statements.

We disagree. It was not obvious that Laurent's name had been redacted or that Merritt was referring to him. *See United States v. Taylor*, 745 F.3d 15, 29 (2d Cir. 2014) (finding that it was "obvious" that names had been omitted where the wording "suffer[ed] from stilted circumlocutions."). The alterations were similar to those we have approved in other cases. *See id.* (collecting cases approving the use of phrases like "another guy" and "this guy" against *Bruton* challenges). Finally, when the redacted statements were admitted, the district court emphatically instructed the jury that one defendant's self-inculpatory statements were not to be considered by the jury as evidence against any co-defendant, further mitigating any prejudicial effect from the properly redacted statements.

Nor has Laurent carried his "heavy burden" to show that any prejudice he suffered from a joint trial with Merritt was "so severe that his conviction constituted a miscarriage of justice." *United States v. James*, 712 F.3d 79, 104 (2d Cir. 2013) (quoting *United States v. Ferguson*, 676 F.3d 260, 286-87 (2d Cir. 2011)). Rather, the court acted within its discretion to deny his motion to sever the trials in the interest of judicial economy.

2.    <u>*Brady*</u> Claim

Laurent also contends that the district court erred in excluding statements from unavailable witnesses, or alternatively, in denying Laurent's request to give a missing witness instruction. At trial, Laurent sought to introduce police reports reflecting statements made by three witnesses to the Duncan murder — Louis Ivies, Dwight St. Louis, and Mark Johnson — in which individuals other than Laurent were identified as the shooter. Laurent argued that the hearsay statements should have been admitted as a sanction against the government's failure to call those witnesses or timely provide contact information for them.

The government identified those witnesses and provided their statements to Laurent pursuant to its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), in 2012, 2013, and January 2015, well before trial commenced in February 2015.[15] *United States v. Ashburn*, No. 11-cr-303, 2015 WL 5098607, at *42–43 (E.D.N.Y. Aug. 31, 2015). Laurent does not contest the timeliness of the

---

[15] The government initially identified Ivies using a pseudonym but provided his true name and last known address to defense counsel in January 2015, nearly four weeks before jury selection began. The timing of this disclosure was justified in light of the fact that Ivies was a member of the Crips and had been shot by Laurent five times. *See United States v. Rodriguez*, 496 F.3d 221, 228 n.6 (2d Cir 2007) ("We recognize that in many instances the Government will have good reason to defer disclosure. . . . In some instances, earlier disclosure could put the witness's life in jeopardy, or risk the destruction of evidence.").

provision of the *Brady* materials, but instead contends that the government provided the witnesses' contact information only on the eve of trial after that information became "stale," which prevented him from locating the witnesses. Laurent Br. at 44.

*Brady* requires that the government disclose evidence that is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). There is no showing that the government failed to provide Laurent with all exculpatory information of which it was aware, in a detailed form. *Brady* does not impose an affirmative duty on the government to learn and provide to the defendant updated contact information that is unknown to the government relating to witnesses with whom it has not been in contact since the addresses provided to the defendant were valid. The district court did not err in concluding that the government's *Brady* disclosures gave Laurent "a reasonable opportunity either to use the evidence in the trial or to use the information to obtain

evidence for use in the trial" and were "sufficiently specific and complete to be useful." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).[16]

As to Laurent's claim concerning the missing witness instruction, because the witnesses were not "peculiarly within [the] power" of the government to produce, the court did not abuse its discretion in refusing to give the requested missing witness charge. *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988).

### 3.    Fourth Amendment Claim

Laurent contends that the district court erred by admitting a handgun that officers seized from his bedroom without a warrant. On the evening of June 21, 2010, New York police officers responded to a call reporting shots fired at Laurent's residence. Upon arrival, Officer Hodos spoke with the caller, Siedel Chesney, who reported that approximately five to ten minutes earlier a bullet had come through his wall from the adjacent room, which belonged to Laurent. Officer Hodos found the room locked and entered by

---

[16] Laurent provides no argument as to why the disclosures made by the government — which included providing St. Louis's name nearly three years before trial, and Johnson's and Ivies' names and last-known addresses several weeks before jury selection even began — prevented defense counsel from having a "reasonable opportunity" to locate these potential witnesses.

force in order to ascertain whether there was someone injured inside, and to ensure his own safety. Seeing the room empty, Officer Hodos looked in the room's possible hiding spots, including in a closet and under the bed. He noticed an eight-to-ten-inch slit, which contained a gun, in the uncovered box spring. Police officers collected the gun (which was discovered to be loaded) and, later, ballistics testing matched it to bullets that were used in the murder of Brent Duncan.

The Fourth Amendment does not require law enforcement to obtain a warrant to search a home if "exigent circumstances" exist, including the need "to assist persons who are seriously injured or are threatened with imminent injury." *United States v. Caraballo*, 831 F.3d 95, 102 (2d Cir. 2016) (quoting *Riley v. California*, 573 U.S. 373, 402 (2014)). In determining whether exigent circumstances existed, the "core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or take action." *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008) (citations and quotation marks omitted). While "the ultimate determination of whether a search was objectively reasonable in light of exigent circumstances is a

question of law reviewed *de novo*," the district court's factual determinations concerning the extent of the exigency are reviewed for clear error. *United States v. Andino*, 768 F.3d 94, 98 (2d Cir. 2014).

At the time they entered Laurent's locked room, the officers knew that only minutes before a shot had been fired from the locked room into the neighboring room. The district court did not err, much less clearly err, in finding that exigency justified the officers' entry into the room and cursory investigation of the areas of the room that were out of view, where an injured person or a person representing a threat of harm could be. Nor is there merit to Laurent's claim that the district court clearly erred in finding that a firearm located in an eight-to-ten-inch slit in an uncovered box spring was in plain view.

**B.** <u>Ashburn</u>

1. Right to a Public Trial

Ashburn contends that he is entitled to a new trial because the court violated his Sixth Amendment "right to a . . . public trial" when it excluded his children from the courtroom during two days of jury deliberations. U.S. Const. amend. VI.

"The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial, is not a step to be taken lightly." *English v. Artuz,* 164 F.3d 105, 108 (2d Cir. 1998) (internal quotation marks omitted). But while the Sixth Amendment creates a "presumption of openness," "[t]he public trial guarantee is not absolute." *United States v. Gupta,* 699 F.3d 682, 687 (2d Cir. 2012) (internal quotation marks omitted). Rather, a "partial" courtroom closure may be justified by a "substantial reason" to exclude certain members of the public from the courtroom, as long as the closure is "no broader than necessary," and the court "considers reasonable alternatives to closing the proceeding" and "makes findings adequate to support the closure." *United States v. Smith,* 426 F.3d 567, 571 (2d Cir. 2005); *cf. Waller* v. *Georgia,* 467 U.S. 39, 48 (1984) (creating more stringent test to justify full courtroom closure).

Because a violation of the right to a public trial is a structural claim, it is not subject to harmless error review; however, where, as here, the defendant failed to object to the exclusion, we review the claim for plain error. *United States v. Gomez,* 705 F.3d 68, 75 (2d Cir. 2013).

We need not decide whether it was error to exclude Ashburn's children, because any error was not "plain" and did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted). The district court explained that it was the court's "general rule" to exclude small children from the courtroom during jury deliberations because the presence of children could "prejudice the jury," and offered the alternative of permitting the children to watch the proceedings in a separate room. Ashburn App'x at 101. Ashburn's counsel did not object to that reasoning or the suggested alternative, instead stating only that he had no questions about it.

The court's restriction was narrowly targeted to small children and was in place for only two days of jury deliberations during the three-week trial. While the fact that the excluded observers were Ashburn's family members heightens our concern, the court's exclusion did not seriously affect the fairness, integrity, or public reputation of the trial, particularly in light of Ashburn's acquiescence and the alternative offered *sua sponte* by the district court. *Cf. Gomez*, 705 F.3d at 75 (finding no plain error where court excluded defendant's family from entire *voir dire* process, where error was invited); *see*

*also United States v. Ledee*, 762 F.3d 224, 231 (2d Cir. 2014) (stating that "a district court has the duty to *sua sponte* consider reasonable alternatives to closure" but finding no error where court adequately justified closure).

2. Procedural and Substantive Unreasonableness

Ashburn contends that his sentence was procedurally and substantively unreasonable because the district court failed to adequately explain its consideration of the sentencing factors specified in 18 U.S.C. § 3553(c). We disagree.

"[S]ection 3553(c)(2) does not require that a district court refer specifically to every factor in section 3553(a)." *United States v. Goffi*, 446 F.3d 319, 321 (2d Cir. 2006). Rather, "[i]n the absence of record evidence suggesting otherwise, we presume that a district judge has faithfully discharged [the] duty to consider all § 3553(a) factors when imposing sentence." *United States v. Cheverie*, 186 F. App'x 77, 78 (2d Cir. 2006). Here, the district court explicitly considered several factors, including the nature and circumstances of the crime, the seriousness of the offense, and the need to protect the public. The court also noted that life imprisonment was mandated on Count Four. Weighing these factors, the court sentenced Ashburn to life in prison on

Counts One and Two, to run concurrently with one another; life in prison

without the possibility of release on Count Four, to run consecutively to

Counts One and Two; and ten years in prison on Count Three (which we now

vacate), to run consecutively to Counts One, Two, and Four. While these

sentences are undoubtedly severe, we cannot say that the crimes for which

Ashburn was convicted do not warrant sentences of such severity. We

perceive no error and reject Ashburn's claim.

**C.** <u>Merritt</u>

Merritt contends that the ineffective assistance of his trial counsel

requires vacatur of his convictions. He contends his counsel was

"unprofessional and obnoxious" and that his counsel violated his professional

responsibilities by engaging in "cryptic" and ineffective motion practice.

Merritt Br. 35. Although on rare occasions appellate claims of ineffective

assistance of counsel are so clearly meritorious on their face or, more often, so

clearly lacking in merit, that they may be assessed on appeal without benefit

of district court findings based on an evidentiary record of inquiry into the

issue, contentions of this nature generally cannot be assessed without a

factual inquiry. Former counsel, if available, is frequently called on to explain the criticized conduct.

Because Merritt did not raise these contentions in the district court, there is no record that would permit them to be assessed on this appeal. We recognize that these contentions could not, as a practical matter, have been raised in the district court because throughout the district court proceeding Merritt was represented by the attorney of whom he now complains. This does not mean that the claim is forfeited. It means only that the claim is not amenable to adjudication in this appeal and must be raised in the district court by collateral attack – normally a motion under 28 U.S.C. § 2255. Appeal will lie from the district court's ruling on such a motion.

Because the contentions were not raised in the district court proceedings and consequently there is no district court record for us to review, we will not adjudicate these claims of ineffective assistance of counsel claims on this appeal.[17] Merritt is free to raise them in the district court through a motion under § 2255.

---

[17] In declining to adjudicate claims of ineffective assistance of counsel that were not raised in the district court, appellate courts sometimes attribute that decision to the court's preference, sometimes saying that the court has an "aversion" to adjudicating claims of

**CONCLUSION**

For the foregoing reasons, 1) the conviction of Trevelle Merritt on Count Three is VACATED; we REMAND to the district court to decide whether to vacate his sentences on the counts here affirmed and resentence him in view of the elimination of the Count Three sentence; 2) the conviction of Jamal Laurent on Count Ten and its attendant sentence is REVERSED and that count is DISMISSED with prejudice, and 3) in all other respects, the judgments of conviction are AFFIRMED.

---

ineffective assistance of counsel on direct appeal from the conviction. We believe such language does not correctly explain why such claims are generally not heard on direct appeal but serves rather as a surrogate locution for the more complex explanation that the absence of a district court record makes consideration on appeal at least impractical and often impossible. Furthermore, on the relatively rare occasions when the criticized trial counsel was relieved during the district court process and the successor counsel raised the claim of the predecessor's ineffective representation in the district court, so that there would be a trial record supporting appellate adjudication, a court of appeals would have no reason to decline to adjudicate the claim on direct appeal. We clarify that our decision not to consider these claims on this appeal is because of the absence of a record to review and not because of personal preferences. While the Supreme Court is vested with discretion to decide, in granting or denying writs of certiorari, what cases and issues it will review, an inferior court my not decline to decide an issue that is properly raised before it simply because it prefers not to.